**UNITED STATES of America**

v.

**Sholam WEISS, et al.**

**Case No. 6:98–cr–99–Orl–19KRS.**

United States District Court,
M.D. Florida,
Orlando Division.

May 27, 2011.

## ORDER

PATRICIA C. FAWSETT, District Judge.

This case comes before the Court on the following:

1. Motion for Summary Judgment by United States of America (Doc. No. 2327, filed Jan. 31, 2011);

2. Statement of Uncontested Material Facts in Support of Motion for Summary Judgment by United States of America (Doc. No. 2328, filed Jan. 31, 2011);

3. Motion for Summary Judgment by Petitioner Goldie Feig (Doc. No. 2329, filed Jan. 31, 2011);

4. Statement of Facts in Support of Motion for Summary Judgment by Petitioner Goldie Feig (Doc. No. 2330, filed Jan. 31, 2011);

5. Response to Petitioner's Motion for Summary Judgment by United States of America (Doc. No. 2338, filed Feb. 14, 2011);

6. Response to Government's Motion for Summary Judgment by Petitioner Goldie Feig (Doc. No. 2339, filed Feb. 14, 2011);

7. Response to Government's Statement of Uncontested Material Facts by Petitioner Goldie Feig (Doc. No. 2340, filed Feb. 14, 2011);

8. Reply to Response to Petitioner's Motion for Summary Judgment by Petitioner Goldie Feig (Doc. No. 2343, filed Feb. 25, 2011);

9. Notice of Filing Apostille for the Affidavit of Rabbi Solomon Unsdorfer by Petitioner Goldie Feig (Doc. No. 2344, filed Mar. 2, 2011);

10. Notice of Filing a Re–Notarized Affidavit of Rabbi Salomon Unsdorfer by Petitioner Goldie Feig (Doc. No. 2348, filed Mar. 17, 2011);

11. Notice of Filing a Re–Notarized Affidavit of Sholam Weiss by Petitioner Goldie Feig (Doc. No. 2349, filed Mar. 17, 2011);

12. Reply to Response to Government's Statement of Uncontested Material Facts in Support of Motion for Summary Judgment by United States of America (Doc. No. 2345, filed Mar. 7, 2011);

13. Reply to Response to Government's Motion for Summary Judgment by United States of America (Doc. No. 2346, filed Mar. 7, 2011);

14. Report and Recommendation of United States Magistrate Judge Recommending the Denial of the Motions for Summary Judgment of Petitioner and United States of America (Doc. No. 2367, filed Apr. 15, 2011);

15. Objections to Report and Recommendation by United States of America (Doc. No. 2371, filed Apr. 28, 2010);

16. Objections to Report and Recommendation by Petitioner Goldie Feig (Doc. No. 2372, filed Apr. 29, 2010);

17. Response to Petitioner's Objections to Report and Recommendation by United States of America (Doc. No. 2378, filed May 13, 2011); and

18. Response to Government's Objections to Report and Recommendation by Petitioner Goldie Feig (Doc. No. 2379, filed May 13, 2011).

## Background

### I. Procedural History

Defendant Sholam Weiss was convicted of various crimes, including racketeering in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq. (Doc. No. 1267, filed Nov. 1, 1999.) The jury found that Weiss should forfeit specifically named properties and money. (Doc. No. 1276, filed Nov. 2, 1999.) During the criminal trial Weiss admitted that he used nominees to "hide out" from banks and judgment creditors. (Doc. No. 2328–45 at 3.) The Court has noted throughout the post-trial proceedings in this case that Weiss typically used the *modus operandi* of installing nominees to act as a front in name for Weiss's ownership interests. (Doc. No. 1955 at 6–7.)

On January 19, 2009, the Court entered a Preliminary Order of Forfeiture for Substitute Assets belonging to Weiss in partial satisfaction of the outstanding forfeiture money judgment. (Doc. No. 2137.) The substitute assets include real properties located at 255 Viola Road, Monsey, New York ("Viola Road") and 65 East Concord Drive, Monsey, New York ("Concord Drive"). (*Id.* at 1–2.) Both of these properties are presently titled in the name of Weiss's wife, Goldie Feig Weiss ("Feig"). (*Id.*)

On November 24, 2009, Feig filed a Petition of Innocent Ownership to exclude the Viola Road and Concord Drive properties

from forfeiture. (Doc. No. 2251.) Both the Government and Feig have moved for summary judgment on the Petition, and Magistrate Judge Karla R. Spaulding has entered a Report and Recommendation denying both Motions. (Doc. Nos. 2327, 2328, 2367.) Feig and the Government have filed objections to the Report and Recommendations, and both parties' objections are opposed by a response. (Doc. Nos. 2371–72, 2378–79.)

## II. Viola Road

The disputed ownership of the Viola Road property centers on the validity of a Separation Agreement between Feig and Weiss purporting to transfer the Viola Road property from Weiss to Feig and the extent to which Weiss resided at and exercised control over the Viola Road property after he and Feig separated. The evidence of record on each of these matters is discussed below.

### A. Separation Agreement

Weiss and Feig were married in 1975. (Doc. No. 2309–1 at 1.) On July 2, 1988, Weiss purchased the Viola Road property, taking title in his name only. (Doc. No. 2328–3 at 1; Doc. No. 2328–4 at 3.) Feig has lived at the Viola Road property since 1989. (Doc. No. 2328–5 at 3; Doc. No. 2251 ¶¶ 5, 7.)

Weiss was the President and sole shareholder of Windsor Plumbing Supply, Inc. ("Windsor"). (Doc. No. 2328–1 at 4.) Two lawsuits were filed against Weiss and Windsor in November of 1988 and January of 1989. (Doc. No. 2328–7 at 7; Doc. No. 2328–9 at 1.) On May 25, 1989, Weiss mortgaged the Viola Road property for $250,000 in favor of Moshe Mishal. (Doc. No. 2328–11.) On August 17, 1989, Weiss

filed a satisfaction of this mortgage reflecting payment of $300,000. (Doc. No. 2328–13.) On the same day, Weiss took out another mortgage on the Viola Road property in the amount of $390,000 from Williamsburg Savings Bank. (Doc. No. 2328–14.)

Pursuant to a "Separation Agreement" dated October 26, 1989, Weiss transferred the Viola Road property to Feig. (Doc. No. 2328–30 ¶ 2.) On March 9, 1990, approximately six weeks after Windsor's creditors filed a petition for involuntary bankruptcy against Windsor,[1] Weiss filed a deed in the New York public records transferring title of Viola Road to Feig. (*Id.*; Doc. No. 2328–20.)

In her deposition of October 19, 2010, taken for purposes of the instant proceeding, Feig testified that she did not have conversations with Weiss about family financial decisions and that Weiss alone made those decisions. (Doc. No. 2328–5 at 9.) Feig further stated that Weiss never told her how much money he made per month and that she and Weiss never discussed Weiss's business or assets. (*Id.* at 13–14.)

The Receiver for National Heritage Life Insurance Company deposed Feig on October 27, 2004. (Doc. No. 2338–1.) During that deposition, Feig asserted that she did not read the Separation Agreement and did not speak with any lawyer about the Agreement prior to signing it. (*Id.* at 3–4, 7.) Feig also testified that Weiss did not disclose his financial status to her before she signed the Agreement. (*Id.* at 7–8.)

Feig filed an affidavit dated February 14, 2011, in response to the Government's Statement of Undisputed Facts filed in support of its Motion for Summary Judg-

---

**1.** On March 21, 1990, Weiss filed a petition converting Windsor's involuntary Chapter 7 bankruptcy to a Chapter 11 bankruptcy. (Doc. No. 2328–1.) The petition listed seven-teen pending actions against Windsor and Weiss and indicated that the bankruptcy involved $18 million in liabilities. (Doc. No. 2328–1 at 3, 11–12.)

ment. (Doc. No. 2340–1.) In her February 2011 affidavit, Feig asserted that at the time Weiss purchased Viola Road in 1988, she mistakenly believed that Viola Road was owned by Weiss and her together. (*Id.* ¶ 3.) Feig further explained that she "did not really take part" in negotiating the terms of the Separation Agreement because that was not her religious custom. (*Id.* ¶ 6.) Rather, she trusted her father and a three-rabbi tribunal "to make a fair arrangement that would allow [her] and [her] children to continue to live" at the Viola Road residence. (*Id.*) Feig maintained that she did not want to get a divorce in 1989 because her children were still young and because divorce was not favored in her religious community. (*Id.* ¶ 8.)

The Separation Agreement bears the notary public stamp of Jan R. Schneiderman and two purported signatures of Schneiderman attesting to the execution of the Separation Agreement before her by Weiss on October 5, 1989, and by Feig on October 26, 1989. (Doc. No. 2328–30 at 11.) Schneiderman testified in a deposition in 1992 that she drafted the Separation Agreement based on a list of terms provided to her. (Doc. No. 2340–8 at 33.) She further testified that Feig came to her office to sign the Agreement. (*Id.*)

On February 1, 2004, Feig testified during a deposition in a civil case that she signed the Separation Agreement at Schneiderman's office. (Doc. No. 2340–5 at 15.) During her October 2004 deposition, Feig testified that she did not remember the circumstances surrounding the signing of the Separation Agreement, including whether Weiss was present when she signed the Agreement. (Doc. No. 2338–1 at 3.) Most recently, Feig averred in her February 2011 affidavit that she "can[ ]not really recall" signing the Separation Agreement "in detail." (Doc. No. 2340–1 ¶ 6.)

In a declaration signed in October 2010 and filed by the Government in support of its present Motion for Summary Judgment, Schneiderman attested that Weiss first approached her in early 1990 about preparing a separation agreement in order to protect his assets. (Doc. No. 2328–29 ¶ 7.) She further averred that Weiss instructed her to back-date the agreement so that it would precede the Windsor bankruptcy proceeding. (*Id.* ¶ 11.) Schneiderman also declared that sometime in March 1990, Weiss brought her the executed Separation Agreement, at which time she refused to notarize Feig's signature because Feig was not present. (*Id.* ¶ 24.) Schneiderman asserted that she did not actually sign or affix her notary stamp on the Separation Agreement. (*Id.* ¶¶ 30–31.) Finally, Schneiderman claimed to have lied about these matters in her 1992 deposition discussed above. (*Id.* ¶ 34.)

Feig filed an affidavit by Weiss dated March 17, 2011, in response to the Government's Statement of Undisputed Facts filed in support of its Motion for Summary Judgment. (Doc. No. 2349–1.) In this Affidavit, Weiss contended that Feig's father retained the services of Rabbi Salomon Unsdorfer to represent Feig in a divorce from Weiss. (*Id.* ¶ 12.) This assertion is corroborated by Rabbi Unsdorfer, who averred that he was one of the three rabbis that assisted in the Settlement Agreement negotiations. (Doc. No. 2348–1 ¶ 4.) Both Weiss and Rabbi Unsdorfer further asserted that it was agreed amongst Weiss, Feig's father, and the three rabbis that a Separation Agreement would be drafted in lieu of a divorce at that time. (*Id.* ¶¶ 7–9; Doc. No. 2349–1 ¶ 12.) Weiss maintained that after the terms of the Settlement Agreement were negotiated, attorney Leo Fox introduced Weiss to attorney Donald Swords, who made the initial draft of the Settlement Agreement. (Doc. No. 2349–1 ¶ 16.) Ac-

cording to Weiss, Swords took ill, and Fox introduced Weiss to Schneiderman who finalized the Settlement Agreement. (*Id.* ¶ 17.)

## B. Weiss's Involvement with Viola Road after the Separation Agreement

In her February 2011 affidavit, Feig averred that her marital relationship with Weiss ended in 1989 shortly after they moved to the Viola Road property and that Weiss rented an apartment in Manhattan where he spent "the majority of his time living and working." (Doc. No. 2340–1 ¶ 5.) Feig further stated that Weiss only came to the Viola Road residence to see his children on the Jewish Sabbath and for Jewish holidays. (*Id.*) Feig recalled that although Weiss occasionally left some personal and religious effects at the Viola Road residence, he did not keep his regular wardrobe at Viola Road after their separation. (*Id.* ¶ 9.) Feig asserted that despite remaining separated from Weiss, he would "occassional[ly]" visit to "keep up appearances" for the sake of the children by sitting at the head of the dinner table and playing host to guests in the home. (*Id.*) Feig maintained that despite Weiss's presence at Viola Road, they remained separated. (*Id.* ¶ 10.) Feig conceded to cooperating with Weiss in subsequently mortgaging the Viola Road property, "but only with the understanding that such cooperation was for the purpose of guaranteeing [Weiss'] ongoing ability to support the family." (*Id.* ¶ 11.) Weiss's averments in his March 2011 affidavit regarding his involvement with the Viola Road property following his separation from Feig are consistent with Feig's account in her February 2011 affidavit. (Doc. No. 2349–1 ¶¶ 23, 26, 29, 30.)

The assertions of Feig and Weiss about Weiss's limited presence at the Viola Road property are contrasted by the testimonies of Schneiderman and Jan Stark. Schneiderman attested in her October 2010 declaration that while Weiss had apartments in Manhattan at various times, his true residence was Viola Road. (Doc. No. 2328–29 ¶ 37.) According to Schneiderman, it was not "uncommon" for Weiss to leave his New York apartment late at night, drive to Viola Road to sleep, and call Schneiderman on the telephone along the way. (Doc. No. 2328–31 at 16.) Schneiderman also recalled frequent invitations to the Viola Road property for family events, most particularly for the celebration of the Jewish Sabbath on Saturday afternoons. (Doc. No. 2328–29 ¶ 38.) During her visits to Viola Road, Schneiderman noted that Weiss shared a bedroom with his wife, that his wife brought his clothes to the dry cleaner, that his personal items were visible throughout the house, that he maintained a fully-furnished, newly built home office there, and that he referred to Viola Road in Monsey, New York as his "home." (*Id.* ¶ 39.) Schneiderman also claimed to have paid phone bills and for improvements to the Viola Road property from money she was holding for Weiss between 1992 and 1994. (Doc. No. 2328–31 at 28–30.)

Jan Stark, who at times lived at the Viola Road property, also indicated that Weiss retained control over the Viola Road property following the Separation Agreement. (Doc. No. 2328–32 at 11–12.) Stark recalled that Weiss was "very involved" in a neighborhood dispute concerning the repaving of a road, (*id.* at 10), and that Weiss arranged for the construction of a custom-made television cabinet in his bedroom at the Viola Road property. (*Id.* at 11.) Stark asserted that he saw Weiss stay overnight at the Viola Road residence during the week, not merely on the Sabbath. (*Id.* at 11–12.) Stark also testified that Feig was not involved in the day-to-day decision making at the Viola Road residence. (*Id.* at 19.)

## III. Concord Drive

The parties' dispute over the Concord Drive property surrounds whether Feig's actions demonstrate that she is more than a mere nominal title holder of the property. Feig's parents wanted to move from Belgium to the United States in 1994 to be closer to her and her sister. (Doc. No. 2340–1 ¶ 13; Doc. No. 2340–9 at 27–28.) Schneiderman averred that in 1994 when she was visiting Weiss and his family on the Sabbath, Weiss told her "of his plans to purchase a home for his wife's parents." (Doc. No. 2328–29 ¶ 41.) Weiss denied making this statement to Schneiderman, (Doc. No. 2349–1 ¶ 33), and other evidence of record indicates that Feig's father actually purchased the Concord Drive property.

The testimonies of Feig and her sister, Sylvie Weiss ("Sylvie"), differ in some respects regarding how their parents purchased the Concord Drive property. Sylvie testified that she and Feig viewed the property once and that her parents informed her over the telephone from Belgium that they would buy the home. (Doc. No. 2340–9 at 28–29.) Sylvie recalled her father instructing her to pick up money from one of his business associates that he transferred to the United States. (Id. at 29.) Sylvie asserted that these funds covered the total purchase price of the house. (Id. at 37.) Sylvie testified that she picked up the funds and delivered them to Edward Burnbaum, the attorney who handled the closing. (Id. at 30–31.) According to Sylvie, the Concord Drive property was titled in Feig's name rather than her parents' names because her parents were not American, were old, and were not in the United States to sign the necessary papers at the time of closing. (Id. at 32, 34–35.) Sylvie further explained that the house was titled in Feig's name rather than her name because she was receiving Section 8 housing at the time. (Id. at 38.)

Sylvie testified that after the house was purchased, she and her husband hired contractors to renovate the house, her father sent $30,000 to pay for the renovations, she paid the contractors that money, and that Feig helped plan the renovations. (Id. at 40–42.) According to Sylvie, her parents' bills were sent to the Concord Drive property, and she and Feig assisted their parents in remitting their bills for payment with their parents' funds. (Id. at 46–48.)

During her October 2010 deposition, Feig testified that she picked out the Concord Drive property for her parents, (Doc. No. 2328–5 at 30), but she averred in her February 2011 affidavit that she picked out the home with Sylvie. (Doc. No. 2340–1 ¶ 13.) Like Sylvie, Feig stated that the purchase money for the Concord Drive property came from her father, although Feig did not recall how the money was received from her father. (Doc. No. 2328–5 at 30.) Unlike Sylvie, Feig maintained that the bills for the Concord Drive property were sent to the Viola Road address. (Doc. No. 2340–1 ¶ 15.) Feig further averred, consistent with Sylvie's testimony, that her mother's bills were paid from her mother's own funds. (Id.) However, Feig explained during her October 2010 deposition that Weiss provided her money to pay the bills for the Concord Drive property and that she paid her mother's bills with funds provided by both Weiss and her mother. (Doc. No. 2328–5 at 38, 41.)

In 1997, a mortgage was taken out on the Concord Drive property for $210,000. (Doc. No. 2340–1 ¶ 16.) Feig averred in her February 2011 affidavit that she was unaware of the mortgage in 1997 and that Weiss fraudulently arranged for that mortgage by falsifying the necessary documents and forging the necessary signatures. (Id.) At the same time, Feig admitted during her October 2010 deposition

that her handwriting and signature were on some, but not all, of the loan documents, and she did not recall applying for a mortgage loan on Concord Drive. (Doc. No. 2328–5 at 34.) Feig also conceded that she regularly signed documents that Weiss gave her without reading them. (*Id.* at 34, 44.)

Weiss contended in his March 2011 affidavit that Feig was not aware of the mortgage on the Concord Drive property and that Schneiderman forged the signatures required to obtain the mortgage loan. (Doc. No. 2349–1 ¶ 37.) In contrast, Schneiderman stated that she had no knowledge of a mortgage taken out on the Concord Drive property in 1997. (Doc. No. 2328–21 at 26.)

The mortgage proceeds of $200,122.35 were disbursed by a check payable to Feig dated March 20, 1997. (Doc. No. 2328–41.) On March 24, 1997, $200,122.35 was deposited into the bank account of Feig and Sylvie. (Doc. No. 2328–41 at 1.) A check bearing the signature "Goldie Weiss" in the amount of $100,000.00 was written from that account to Leo Fox on March 26, 1997. (Doc. No. 2328–43 at 1.) Feig testified that she had no knowledge regarding what was done with the proceeds of the mortgage. (Doc. No. 2328–5 at 34.) She also did "not specifically recall signing any checks." (Doc. No. 2340–1 ¶ 17.) Similarly, Sylvie Weiss testified that she was not aware of the mortgage proceeds deposited into her joint bank account with Feig or the check issued to Fox. (Doc. No. 2328–33 at 13–14.) Weiss maintained that he "deceived" Feig to cause her to write the check to Fox by leading her to believe that he had directed money from a business deal into her account for her support. (Doc. No. 2349–1 ¶ 37.)

During her October 2010 deposition, Feig could not recall when she started making payments on the Concord Drive mortgage, except that she was making payments "two [or] three years later." (Doc. No. 2328–5 at 36.) Feig admitted that she received money to pay the mortgage from Weiss. (*Id.*) In 2003, Feig refinanced the mortgage on Concord Drive in order to lower the payment pursuant to her son's advice. (Doc. No. 2328–44; Doc. No. 2328–5 at 36–37.) The refinancing documents bear the initials "GF" and the signature "Goldie Feig." (*Id.*)

**Standard of Review**

**I. RICO Forfeiture**

RICO provides for the criminal forfeiture of "any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity ...." 18 U.S.C. § 1963(a)(3). Following the entry of an order of forfeiture, "[a]ny person, other than the defendant, asserting a legal interest in the property which has been ordered forfeited to the United States" may petition the court for a hearing to adjudicate the validity of the alleged interest. *Id.* § 1963(*l*)(1)-(2). The ancillary proceeding permitting a third party to challenge the forfeiture of assets is "essentially identical" to the criminal forfeiture proceeding following a conviction for a controlled substances offense as set forth in 21 U.S.C. § 853(n). *United States v. Marion,* 562 F.3d 1330, 1341 n. 8 (11th Cir.2009); *see also United States v. De La Mata,* 535 F.3d 1267, 1272 n. 17 (11th Cir.2008) ("21 U.S.C. § 853(n) ... authorizes third party proceedings identical to those of 18 U.S.C. § 1963(*l*)."); *United States v. Watkins,* 320 F.3d 1279, 1283 n. 2 (11th Cir.2003) ("[C]ases applying one of these analogous statutes have used section 853(n) and section 1963(*l*) cases interchangeably." (quotation omitted)).

■ "To establish his legitimate entitlement to the forfeited property, the petitioner must show that (1) title to the prop-

erty was vested in him rather than the defendant at the time of the act which made the property subject to forfeiture; (2) his title to the property was superior to the title held by the defendant at the time of the act which made the property subject to forfeiture; or (3) that he purchased his interest without reasonable cause to know that the property was subject to forfeiture." *United States v. Gilbert,* 244 F.3d 888, 911 (11th Cir.2001), *superseded in part by rule as stated in, Marion,* 562 F.3d at 1341; *accord* 18 U.S.C. § 1963(*l*)(6)(A)-(B). "[T]he third-party petitioner, and not the government, bears the burden of proving one of these limited grounds by a preponderance of the evidence." *Gilbert,* 244 F.3d at 911. In addition to any evidence presented by the petitioner and Government during the ancillary proceedings, "the court shall consider the relevant portions of the record of the criminal case which resulted in the order of forfeiture." 18 U.S.C. § 1963(*l*)(5). Ancillary forfeiture proceedings are civil in nature and thus governed by the Federal Rules of Civil Procedure. *See Gilbert,* 244 F.3d at 907 ("[A] third-party petition filed under section 1963(*l*) is civil in nature even though it is ancillary to a criminal forfeiture trial.").

■■■ "[A] person or entity cannot have a vested interest in property if that person or entity is found to be acting as a nominee for someone who property is subject to forfeiture." *United States v. Weiss,* 467 F.3d 1300, 1308–09 (11th Cir.2006). "Although federal law defines what interests are subject to criminal forfeiture, 'state property law defines what those interest are.'" *United States v. Browne,* 552 F.Supp.2d 1342, 1345 (S.D.Fla.2008) (quoting *United States v. Kennedy,* 201 F.3d 1324, 1334 (11th Cir.2000)). "Accordingly, a district court will look to the law of the state where the property is located to determine whether the petitioner has a legal right to the forfeited property." *Id.* (citing *Kennedy,* 201 F.3d at 1334).

## II. Summary Judgment

Courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *accord Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Hickson Corp. v. N. Crossarm Co.,* 357 F.3d 1256, 1259 (11th Cir.2004). An issue of fact is "material" under the applicable substantive law if it might affect the outcome of the case. *Hickson Corp.,* 357 F.3d at 1259. An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Id.* at 1260. The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.; Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505.

The party moving for summary judgment has the burden of proving that: (1) there is no genuine issue as to any material fact, and (2) it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion and resolves all reasonable doubts against the moving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. The court may not weigh conflicting evidence or weigh the credibility of the parties. *Hairston v. Gainesville Sun Pub. Co.,* 9 F.3d 913, 919 (11th Cir.1993). If a reasonable fact finder could draw more than one inference from the facts and that

inference creates an issue of material fact, the court must not grant summary judgment. *Id.* On the other hand, summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548. In addition, when a claimant fails to produce "anything more than a repetition of his conclusory allegations," summary judgment for the movant is "not only proper but required." *Morris v. Ross,* 663 F.2d 1032, 1034 (11th Cir.1981).

### III. Objection to a Report and Recommendation of a United States Magistrate Judge

■ A party seeking to challenge the findings in a Report and Recommendation of a United States Magistrate Judge must file "written objections which shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection." *Macort v. Prem, Inc.,* 208 Fed.Appx. 781, 783 (11th Cir.2006) (quoting *Heath v. Jones,* 863 F.2d 815, 822 (11th Cir.1989)). If a party makes a proper objection, the District Court must conduct a de novo review of the portions of the report to which objection is made. *Macort,* 208 Fed.Appx. at 783–84; *see also* 28 U.S.C. § 636(b)(1). The District Court may accept, reject, or modify in whole or in part, the findings or recommendations made by the Magistrate Judge. *Macort,* 208 Fed.Appx. at 784; 28 U.S.C. § 636(b)(1).

### Analysis

Both Feig and the Government have lodged several objections to the Magistrate's Report and Recommendation denying their respective Motions for Summary Judgment. (Doc. Nos. 2371, 2372.) The Court will address each in turn.

### I. Feig's February 2011 Affidavit as a "Sham" Affidavit

In denying the Government's Motion for Summary Judgment, Magistrate Judge Spaulding found that several of the assertions made by Feig in her February 2011 affidavit created genuine issues of material fact regarding the validity of Feig's claims of ownership of the Viola Road and Concord Drive properties. (Doc. No. 2367 at 16, 21.) The Government contends that Feig's February 2011 affidavit was erroneously considered for purposes of summary judgment because it is a sham. (Doc. No. 2371 at 8–9.)

■ The sham affidavit rule states that "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins and Assoc. v. U.S. Indus.,* 736 F.2d 656, 657 (11th Cir.1984). However, "[e]very discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence." *Tippens v. Celotex Corp.,* 805 F.2d 949, 954 (11th Cir.1986) (internal quotation marks omitted). Courts must distinguish "between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence." *Id.* at 953.

■ The sham affidavit rule is inapplicable to Feig's February 2011 affidavit because her prior deposition testimony did not negate the existence of a genuine issue of material fact that her subsequent affidavit attempted to revive. *Junkins,* 736 F.2d at 657. The Government points to the fact that in her February 2011 affidavit, Feig asserted for the first time that the Separation Agreement was negotiated by her father, her husband, and a tribunal

of three rabbis, despite extensive questioning during discovery about the existence and nature of negotiations and disclosures. (Doc. No. 2371 at 8.) Feig testified during her October 2010 deposition that she did not think she ever had a lawyer provide her any guidance or help with the Separation Agreement. (Doc. No. 2328–5 at 13.) Feig further maintained during her deposition and in her responses to the Government's requests for admissions that she did not ask a lawyer to review the Separation Agreement, never specifically told Weiss that she did not want a lawyer, and never thought about hiring a lawyer at all. (*Id.;* Doc. 2309–1 ¶ 12.) Feig also stated that she and Weiss never discussed what real property would be included in the Separation Agreement or made financial disclosures to each other in connection with the Settlement Agreement. (Doc. No. 2328–5 at 11; Doc. 2309–1 ¶¶ 15–19; Doc. No. 2328–5 at 13.) Feig maintained that Weiss did not tell her how much money he made per month and that there were no negotiations between Weiss and Petitioner about the terms of the Separation Agreement. (Doc. No. 2328–5 at 13.) Feig's testimony during her October 2010 deposition is consistent with her October 2004 deposition, in which she stated that she did not read the Separation Agreement prior to signing it, that she did not speak with any lawyer about the Agreement prior to signing it, and that Weiss did not disclose his financial status to her before she signed the Agreement. (*Id.* at 3–4, 7–8.)

Feig's assertion in her February 2011 affidavit that Weiss, Feig's father, and three rabbis negotiated the Settlement Agreement is not an unexplained contradiction of her prior deposition testimony that she executed the Settlement Agreement without counsel and without any disclosures from Weiss. (Doc. No. 2340–1 ¶ 7.) Feig was not squarely asked during her October 2010 deposition or otherwise during discovery how the Settlement Agreement was negotiated apart from the fact that she did not herself negotiate the Agreement with Weiss. (Doc. No. 2328–5 at 13.) In addition, Feig's deposition testimony that she signed the Settlement Agreement without advice of a lawyer's counsel or full disclosure from Weiss is not wholly inconsistent with her subsequent averments that she did not personally participate in the negotiation of the Settlement Agreement. (Doc. No. 2340–1 ¶ 7.) Accordingly, Feig's deposition testimony that she signed the Settlement Agreement absent counsel or full disclosure from Weiss does not justify striking her February 2011 affidavit as a sham.

The Government further argues that Feig's February 2011 affidavit is a sham because she was extensively questioned about Rabbi Unsdorfer but never stated that he represented her in the Separation Agreement negotiations. (Doc. No. 2371 at 8.) During her October 2010 deposition, Feig was asked to explain who Rabbi Unsdorfer was, and she responded that Unsdorfer was the son-in-law of the Rabbi of the synagogue in Brooklyn where she and Weiss used to pray. (Doc. No. 2328–5 at 7.) Feig further testified that she did not recall ever discussing personal issues with Unsdorfer or meeting with him by herself. (*Id.* at 8.) Feig's deposition testimony is not wholly inconsistent with her averment in her February 2011 affidavit, corroborated by the sworn statements of Unsdorfer, that the Separation Agreement was negotiated by Weiss, Feig's father, and three rabbis in accordance with religious custom. (Doc. No. 2348–1 ¶¶ 5–11; Doc. No. 2350–1 ¶ 7.)

█ The Government also claims that Feig's February 2011 affidavit is a sham because her averment that she signed the Separation Agreement on October 26, 1989, conflicts with her October 2010 depo-

sition testimony that she had no idea when she signed the Separation Agreement. (Doc. No. 2371 at 8 n. 3.) A failure to recall a fact and subsequent recollection of that fact goes to the witness's credibility and is not, by itself, sufficient justification for striking Feig's affidavit as a sham. *See Tippens,* 805 F.2d at 953–54 (noting that a witness's "failure of memory throughout the course of discovery create[s] an issue of credibility," not a sham).

The Government next contends that Feig's February 2011 affidavit is a sham because her assertions that Weiss fraudulently obtained a mortgage on the Concord Drive property by forging her signature on the loan documents blatantly contradict her deposition testimony. (Doc. No. 2371 at 9.) In her February 2011 affidavit, Feig stated as follows:

> In 1997, I was not aware of the $210,000 mortgage taken on the Concord Drive residence. My husband fraudulently arranged for that mortgage. I would never have agreed to mortgage my mother's residence, but my husband apparently falsified the necessary documents and forged the necessary signatures.

(Doc. No. 2340–1 ¶ 16.) In contrast, Feig testified during her October 2010 deposition that her signature appeared on several of the Concord Drive mortgage loan documents, and she admitted to often signing documents given to her by Weiss without reading them. (Doc. No. 2328–5 at 33–36.) However, Feig also testified that some of the handwriting and one signature on the mortgage documents were not her own, and it is unclear whether Feig was asked about all of the mortgage documents during her deposition. (*Id.*) Therefore, Feig's averment in her February 2011 affidavit that Weiss "falsified the necessary documents and forged the necessary signatures" is not inherently or necessarily inconsistent with her prior deposition testimony regarding the Concord Drive mort-

gage documents, and the sham affidavit rule is not triggered. *See Tippens,* 805 F.2d at 954 (declining to strike an affidavit under the sham affidavit rule because it was not "inherently inconsistent" with the deposition testimony); *Lane v. Celotex Corp.,* 782 F.2d 1526, 1532 (11th Cir.1986) (rejecting the application of the sham affidavit rule because the party's affidavit "is not necessarily inconsistent with his earlier deposition testimony").

In summary, none of the asserted inconsistencies between Feig's February 2011 affidavit and prior deposition testimony and admissions render the February 2011 affidavit a sham based on this record, and Feig's February 2011 affidavit was properly considered in addressing the parties' Motions for Summary Judgment.

## II. Weiss's March 2011 Affidavit as a "Sham" Affidavit

██ The Government contends that Weiss's March 2011 affidavit is a sham because it contradicts his trial testimony and other evidence of record. (Doc. No. 2371 at 9–10.) Although the sham affidavit rule applies with equal force to affidavits of non-parties, *Santhuff v. Seitz,* 385 Fed.Appx. 939, 945 (11th Cir.2010), the Court will not strike Weiss's Affidavit as a sham at this time because it was not relied upon in the Report and Recommendation to create a genuine issue of material fact precluding the entry of summary judgment for the Government. *See Junkins,* 736 F.2d at 657 (noting that the sham affidavit rule applies "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact"). Weiss's affidavit was mentioned once in the Magistrate Judge's analysis of the Government's Motion for Summary Judgment merely for the purpose of corroborating an assertion by Feig, which alone created a genuine issue of credibility. (Doc. No. 2367 at 21.)

Therefore, Weiss's March 2011 affidavit will not be stricken as a sham at this juncture.

## III. Schneiderman's Recanted Testimony

■ In a 1992 deposition, Jan Schneiderman testified that she drafted the Separation Agreement based on a list of terms provided to her and that Feig came to her office to sign the Agreement. (Doc. No. 2340–8 at 33.) However, Schneiderman asserted in her October 2010 declaration that she lied about her involvement in the execution of the Settlement Agreement during her 1992 deposition, that Weiss approached her about preparing a separation agreement in early 1990 in order to protect his assets, and that she did not affix her notary stamp on the Settlement Agreement. (Doc. No. 2328–29 ¶¶ 7, 31, 34.) Magistrate Judge Spaulding reasoned that "[w]hich version of her prior statements Schneiderman will adopt if this matter proceeds to trial is a question that the Court cannot resolve on summary judgment." (Doc. No. 2367 at 6 n. 3.) The Government now objects to this finding, arguing that because Schneiderman's inconsistent statements during her 1992 deposition are not admissible for the truth of the matter asserted and may only be used to impeach her, those statements cannot be used to create a genuine issue of material fact for trial. (Doc. No. 2371 at 11.)

While it is true that evidence admissible only for impeachment purposes cannot create a genuine issue of material fact precluding the entry of summary judgment, *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir.1996), Schneiderman's prior sworn deposition testimony is admissible not only to impeach but also for the truth of the matter asserted. Pursuant to Federal Rule of Evidence 801(d)(1)(A), a testifying witness's prior inconsistent statements given under oath in a deposition are not hearsay and may be offered for the truth of the matter asserted. Accordingly, the Magistrate Judge properly found that Schneiderman's inconsistent 1992 deposition testimony and October 2010 declaration created a genuine issue of material fact.

## IV. Feig's Status as Nominee as to Viola Road

■ The Government contends that upon striking Feig's February 2011 affidavit as a sham, summary judgment should be entered for the Government on Feig's claim of innocent ownership of Viola Road because the remaining evidence of record conclusively demonstrates that Weiss exercised dominion and control over the Viola Road property and that Feig was merely Weiss's nominee. (Doc. No. 2371 at 12–13.) As discussed *supra* part I, Feig's February 2011 affidavit is not a sham and may be considered for purposes of the parties Motions for Summary Judgment. Finding no other arguments by the Government on this matter, the Court will adopt Magistrate Judge Spaulding's recommendation that there is a genuine issue of material fact regarding Feig's ownership of the Viola Road property.

## V. Execution of Separation Agreement with Required Formalities

Section 170(6) of the New York Domestic Relations Law mandates certain procedures for executing a separation agreement to be utilized as a predicate for a conversion divorce based upon spouses living separate and apart pursuant to the agreement. In like manner, Section 236(B)(3) of the New York Domestic Relations Law imposes several requirements for executing a marital separation agreement to be enforced in a matrimonial action with respect to economic matters such as property distribution, spousal support, and child custody. Both of these statutes

require the spouses' signatures to be acknowledged or proven in the manner required to record a deed.

██ In discussing whether the Separation Agreement is invalid for purposes of the instant forfeiture proceeding due to improper acknowledgment of signatures, the Report and Recommendation noted that the Government "has not shown that simply because the Separation Agreement may not have been sufficient to support an action for divorce[,] it was null and void for all purposes." (Doc. No. 2367 at 17–18.) The Government objects to this statement, citing *In re Kovler*, 249 B.R. 238 (Bankr. S.D.N.Y.2000), for the proposition that a separation agreement that is not validly executed or is otherwise a sham is not enforceable. (Doc. No. 2371 at 14.)

In *Kovler*, the bankruptcy court entered findings of fact and concluded that a separation agreement purporting to transfer ownership of real property from the debtor-husband to his wife was a backdated sham undertaken to remove the real property from the reach of the husband's creditors in violation of the New York law against fraudulent conveyances. *Kovler*, 249 B.R. at 259. In so holding, the court in *Kovler* noted that to be valid under New York domestic relations law, a marital separation agreement must be acknowledged by a notary or other public official, not merely made under oath by the parties. *Id.* at 251 n. 8.

The court in *Kovler* did not squarely address the distinction drawn in the Report and Recommendation between separation agreements effective in divorce and matrimonial proceedings under New York law and separation agreements used for other purposes, such as proving innocent ownership in a forfeiture proceeding. (Doc. No. 2367 at 17–18.) Although the parties do not cite, and the Court has not found, any authority squarely addressing this issue, it is well-settled under New York law that unacknowledged settlement agreements are enforceable in some proceedings other than divorce and matrimonial actions. *See, e.g., Singer v. Singer*, 261 A.D.2d 531, 690 N.Y.S.2d 621, 622 (N.Y.App.Div.1999) (holding that an unacknowledged settlement agreement was enforceable as an independent contract under which a wife could sue her husband for breach of contract); *Cicerale v. Cicerale*, 85 Misc.2d 1071, 382 N.Y.S.2d 430, 433 (N.Y.Sup.Ct.1976) ("[A]s to the parties themselves, the instrument as a 'separation agreement' may be effective without any acknowledgment ..., and may be the proper basis for other action, but not one for a (conversion) divorce where it has not complied with the legislative mandate for it to constitute a basis for divorce."), *aff'd*, 54 A.D.2d 921, 387 N.Y.S.2d 1022 (N.Y.App.Div.1976). One New York treatise has observed that "a noncomplying [separation] agreement ... is valid and enforceable in any nonmatrimonial litigation in which the agreement is germane, such as a Surrogate's Court proceeding after the death of a party." 9PT2 West's McKinney's Forms Matrimonial and Family Law § 5:2 (2011) (citing *In re Pavese*, 195 Misc.2d 1, 752 N.Y.S.2d 198, 206 (N.Y.Sur.Ct.2002)).

The Court need not decide at this juncture whether an improperly acknowledged separation agreement may be given effect for purposes of the instant federal forfeiture proceeding. Even if proof of valid acknowledgment is required to enforce the Separation Agreement in the instant case, Schneiderman's 1992 deposition testimony that Feig signed the Agreement in her office, (Doc. No. 2340–8 at 33), and the presence of Schneiderman's notary stamp on the Separation Agreement acknowledging the signatures of Feig and Weiss, (Doc. No. 2340–11 at 8), create a genuine issue of material fact regarding whether the Separation Agreement was properly

acknowledged under New York law. *See Garguilio v. Garguilio,* 122 A.D.2d 105, 504 N.Y.S.2d 502, 503 (N.Y.App.Div.1986) (noting that N.Y. Dom. Rel. Law § 170(6) requires acknowledgment of both parties' signatures by a public official, typically a notary public). Finding no other arguments by the Government on this matter, the Magistrate Judge properly denied summary judgment for the Government based on its argument that the Separation Agreement was not validly acknowledged under New York domestic relations law.

## VI. Transfer of Viola Road to Feig as a Fraudulent Conveyance

 In addressing whether the transfer of Viola Road to Feig pursuant to the Settlement Agreement was a fraudulent conveyance under New York law, the Magistrate Judge found that there was a genuine issue of material fact regarding Feig's knowledge of Weiss's purpose for the transfer. (Doc. No. 2367 at 19–20.) The Government objects, asserting that the Magistrate Judge failed to consider whether Feig had constructive knowledge of Weiss's intent to defraud his creditors, not simply whether Feig had actual knowledge of Weiss's fraudulent scheme. (Doc. No. 2371 at 15–17.)

In support of its objection, the Government relies on *HBE Leasing Corp. v. Frank,* 48 F.3d 623 (2d Cir.1995), which states the New York law for setting aside fraudulent conveyances based on a transferee's constructive knowledge of the transferor's fraud as follows:

> [T]he transferee need not have actual knowledge of the scheme that renders the conveyance fraudulent. Constructive knowledge of fraudulent schemes will be attributed to transferees who were aware of circumstances that should have led them to inquire further into the circumstances of the transaction, but who failed to make such inquiry.

*Id.* at 636 (citation omitted). Under this standard, constructive knowledge of a fraudulent scheme is attributed to a transferee based on the circumstances actually known to the transferee, not the circumstances of which the transferee should have been aware. By arguing that constructive knowledge should be attributed to Feig arising from facts which she denied actually knowing but arguably should have known, namely that lawsuits had been filed against Windsor and Weiss and that Weiss was in bankruptcy, the Government misapprehends the applicable constructive knowledge standard. (Doc. No. 2371 at 16–17.)

Feig testified that she and Weiss never discussed Weiss's finances or his businesses and that Weiss made no financial disclosures to her at the time she signed the Settlement Agreement. (Doc. No. 2328–5 at 13–14.) Feig also testified that she knew that Leo Fox, a bankruptcy attorney, represented Weiss in multiple matters but did not know the scope of Fox's representation. (*Id.* at 7.) According to Feig, she wanted to be separated from Weiss without getting a divorce, and she relied on her father, Weiss, and three rabbis to negotiate the Separation Agreement pursuant to religious custom that would allow her and her children to continue to live at the Viola Road residence. (Doc. No. 2340–1 ¶¶ 7–8.) Feig further testified that Weiss always provided for his family. (*Id.* ¶ 10.) Viewing this evidence in the light most favorable to Feig for purposes of the Government's summary judgment motion, the Court finds that there is a genuine issue of material fact regarding the extent of Feig's actual knowledge of Weiss's financial circumstances and debts. Accordingly, a genuine issue of material fact exists regarding whether, based on her actual knowledge, Feig should be attributed constructive knowledge that Weiss conveyed the Viola Road property

with the intent to defraud his creditors. *Frank,* 48 F.3d at 636.

## VII. Forfeiture of Concord Drive

 The Magistrate Judge found that Feig presented sufficient evidence of dominion and control over the Concord Drive property to withstand the Government's Motion for Summary Judgment due to lack of standing. (Doc. No. 2367 at 20–21.) The Government objects, arguing that Feig's actions of record are insufficient as a matter of law to find that she exercised sufficient dominion and control over the Concord Drive property to be considered more than a mere nominee. (Doc. No. 2371 at 18–20.) For the reasons discussed below, the Court agrees with the Government that Feig lacks standing to challenge the forfeiture of Concord Drive and that summary judgment should be entered for the Government on this issue.

 "One who has no interest of his own at stake always lacks standing." *Weiss,* 467 F.3d at 1311 (quotation omitted). "[A] person or entity cannot have a vested interest in property if that person or entity is found to be acting as a nominee for someone whose property is subject to the forfeiture." *Id.* at 1308–09. To determine whether Feig is more than a mere nominee of the Concord Drive property and thus has standing, the Court must look beyond the bare legal title to whether Feig actually exercised dominion and control over the property. *See United States v. Morgan,* 224 F.3d 339, 343 (4th Cir. 2000) (affirming the use of a "dominion and control test" in looking beyond bare legal title to determine whether a wife had a property interest sufficient to prevent criminal forfeiture of the assets at issue); *accord United States v. A Single Family Residence,* 803 F.2d 625, 630 (11th Cir. 1986) (noting in the civil forfeiture context,

"possession of bare legal title by one who does not exercise dominion and control over the property is insufficient even to establish standing to challenge a forfeiture").

The record evidence of Feig's actions, even when viewed in the light most favorable to her, fails to demonstrate that she exercised any dominion and control over the Concord Drive property indicative of a true owner as opposed to a mere nominee. According to Feig, her father purchased the Concord Drive property outright in 1994, the property was titled in her name because her parents were not United States citizens, and she "arranged" to have the property remodeled at her father's expense. (Doc. No. 2340–1 ¶¶ 13–14.) Feig claimed that her father died two years after he purchased the Concord Drive property and that her mother continues to live at there. (*Id.* ¶ 14.) At the same time, Feig has lived at the Viola Road property since 1989, (Doc. No. 2328–5 at 3), and there is no evidence of record suggesting that Feig ever resided at or made day-to-day decisions regarding the Concord Drive property. In addition, there is no evidence of record that Feig inherited any or all of her father's interest in the Concord Drive property upon his death.

Feig explained that the bills for the Concord Drive property "always" went to her house because her parents do not speak English and because her mother does not know how to handle bills. (Doc. No. 2328–5 at 41.) Feig testified that she paid the bills on the Concord Drive property with funds provided by her mother and Weiss for that purpose, (*id.* at 38, 41), and there is no evidence of record that Feig paid the expenses of the Concord Drive property from any other source of funds, including her own.[2]

---

**2.** During an unspecified period of time, Feig received a paycheck from Windsor, and she used the proceeds as "fun money," not to support herself. (Doc. No. 2328–5 at 23.)

Feig's ministerial payment of bills for the Concord Drive property from third-parties' funds is action indicative of a nominee and does not reasonably permit an inference that Feig exercised dominion or control over the property. *See Weiss,* 467 F.3d at 1303 n. 1 ("Nominee 'connotes the delegation of authority to the nominee in a representative or nominal capacity only, and does not connote the transfer or assignment to the nominee of any property in, or ownership of, the rights of the person nominating him.'" (quoting *Braxton v. United States,* 858 F.2d 650, 653 n. 6 (11th Cir.1988))); Black's Law Dictionary 1149 (9th ed. 2009) (defining "nominee" in pertinent part as "[a] party who holds bare legal title for the benefit of others or who receives and distributes funds for the benefit of others"); *cf. United States v. Totaro,* 345 F.3d 989, 995–96 (8th Cir.2003) (finding that the defendant's wife was not merely a straw or nominal owner of a forfeited residence where she lived at the residence, raised her children there, was personally invested in the ownership of the property, and encumbered the property with three tax liens). In addition, the 1997 mortgage of the Concord Drive property, which Feig maintained was "fraudulently arranged" by Weiss, (Doc. No. 2340–1 ¶ 17), cannot reasonably be viewed as evidence of true ownership by Feig. *See United States v. One 1945 Douglas C–54 (DC–4) Aircraft, Serial No. 22186,* 604 F.2d 27, 29 (8th Cir.1979) (noting that the title holder of an aircraft may not have standing to challenge its forfeiture given that the criminal defendant exercised dominion or control over the aircraft by using it as collateral to obtain bond money after his arrest). Similarly, Feig's payment of the mortgage does not reasonably suggest a bona fide ownership interest in the Concord Drive property, as it is undisputed that Weiss provided Feig the funds to pay the mortgage. (Doc. No. 2328–5 at 36.)

Feig refinanced the mortgage on the Concord Drive property in 2003 to obtain a lower interest rate on the advice and direction of her son. (*Id.*) The Government argues, without citing any authority, that Feig's refinancing of a mortgage which she contends was fraudulently obtained cannot reasonably suggest that Feig exercised dominion or control of the ·Concord Road property. (Doc. No. 2371 at 19.) Notwithstanding the Government's argument, any indicia of ownership by Feig in 2003 is irrelevant to this proceeding because Feig must show that her legal right to the property is superior to that of Weiss *"at the time of the commission of the acts which gave rise to the forfeiture of the property"* or that she was without cause to believe that the property was subject to forfeiture at the time of a bona fide purchase. 18 U.S.C. § 1963(*l*)(6)(A)-(B). "[A] third party's claim is to be measured not as it might appear at the time of litigation, but rather as it existed at the time the illegal acts were committed" or the time of the alleged bona fide purchase. *United States v. BCCI Holdings (Luxembourg), S.A.,* 46 F.3d 1185, 1190 (D.C.Cir. 1995). Because Weiss's acts giving rise to the forfeiture of the Concord Drive property occurred prior to April 29, 1998, the date of the Indictment, (Doc. No. 1), Feig cannot rely on her 2003 refinancing of the Concord Drive property to establish an ownership interest in the Concord Drive property superior to Weiss's interest now forfeited to the Government.

Finding no other evidence of record from which it may be inferred that Feig exercised a right or interest in the Concord Drive property beyond that of a bare title holder and nominee, Feig lacks standing to challenge the forfeiture of the Concord Drive property. *Weiss,* 467 F.3d at 1311.

### VIII. Challenge to Citation of Authority

Feig objects to the citation of *United States v. One 1990 Beechcraft, 1900 C Twin Engine Turbo–Prop Aircraft,* 619 F.3d 1275, 1278 (11th Cir.2010), arguing that the *Beechcraft* case applies a legal standard for civil *in rem* forfeiture under 18 U.S.C. § 983(d)(6)(B)(iii) which is inapplicable to the instant criminal forfeiture proceeding. (Doc. No. 2372 at 1–2.) The Court agrees that the statute identified by Feig in *Beechcraft* is inapposite here, but that statute was not applied in the Report and Recommendation, let alone in a manner adverse to Feig. (Doc. No. 2367 at 15.) In addition, the proposition for which Beechcraft was cited—that courts look beyond who possesses bare legal title to property to decide true ownership—is a correct statement of law applicable to the instant forfeiture proceeding. *See, e.g., Braxton,* 858 F.2d at 654–55 (looking to the circumstances surrounding the conveyance, not merely the name on the title, in finding that the claimant was merely a nominee and thus could not prevail under Section 1963(*l*)). Accordingly, Feig's objection to the mere citation of *Beechcraft* is overruled.

### IX. New York Fraudulent Transfer Statute of Limitations

 Feig next argues that the Magistrate Judge erroneously rejected her claim that the Government cannot prevail by showing that the conveyance of Viola Road to Feig was a fraudulent transfer because the six-year statute of limitations for undoing fraudulent transfers under New York law has run. (Doc. No. 2372 at 3–4.) This argument is without merit because, absent any statutory waiver, state statutes of limitations do not apply to actions filed by the federal government. *United States v. Moore,* 968 F.2d 1099, 1100 (11th Cir.1992) (quoting *United States v. Summerlin,* 310 U.S. 414, 416, 60 S.Ct. 1019, 84 L.Ed. 1283 (1940)). Finding no authority imposing state statutes of limitations on federal criminal forfeiture proceedings, Feig's argument that the Government is limited in this proceeding by the six-year statute of limitations for fraudulent conveyances under New York law is without merit.

### X. Testimony of Jan Schneiderman Regarding Weiss's Stated Intentions

Jan Schneiderman declared that Weiss told her that he planned to purchase a home for Feig's parents. (Doc. No. 2328–29 ¶ 41.) Noting Feig's objection that Schneiderman's statement was inadmissible hearsay, Magistrate Judge Spaulding reasoned that the Court need not resolve this evidentiary issue to decide the pending Motions for Summary Judgment. (Doc. No. 2367 at 9 n. 6.) Feig now objects to any consideration of Schneiderman's statement about what Weiss told her. (Doc. No. 2372 at 5.)

Schneiderman's disputed statement was not relied upon by the Magistrate Judge in her analysis of the pending Motions for Summary Judgment. (Doc. No. 2367 at 14–30.) Moreover, notwithstanding the admissibility of Schneiderman's statement regarding Weiss's intentions to purchase a house for Feig's parents, Feig lacks standing to contest the forfeiture of the Concord Drive property. *See supra* part VII. Therefore, the Court need not determine the admissibility of Schneiderman's statement that Weiss told her that he planned to purchase a home for Feig's parents at this juncture.

### XI. Delay in Forfeiture Proceedings

As urged by Feig, the Magistrate Judge applied the four-factor test set forth in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), to determine whether the Government's delay in seek-

ing the forfeiture of the Viola Road and Concord Drive properties violated her right to due process. (Doc. No. 2367 at 23.) The four *Barker* factors are the length of the delay, the Government's reason for the delay, the timeliness of the petitioner's assertion of rights, and the resulting prejudice to the petitioner. *Id.* at 530, 92 S.Ct. 2182. Consistent with the Report and Recommendation, the Court assumes without deciding that the *Barker* test applies to challenges of delays by the Government in seeking forfeiture of substituted assets [3] which have not been seized by the Government. Feig raises several challenges touching upon the second and third *Barker* factors.

### A. Reason for Delay in Seeking Forfeiture of Viola Road and Concord Drive

■ Feig objects to the Magistrate Judge's consideration of the declaration of Special Agent Harry J. Brister in the Report and Recommendation on the grounds that Feig was not afforded an opportunity to depose Brister.[4] (Doc. No. 2372 at 5.) On November 18, 2010, Magistrate Judge Spaulding entered an Order denying Feig's request to depose Brister, noting that the Government and Feig agreed that Brister "has no personal knowledge of the facts at issue." (Doc. No. 2322 at 3.) Brister's statements were not cited in the Report and Recommendation to support a ruling related to Feig's contested ownership of the Viola Road and Concord Drive properties. Rather, Brister's declaration was cited in the Report and Recommenda-

tion to rebut Feig's claim that the Government prejudicially delayed the forfeiture proceedings of the Viola Road and Concord Drive properties. (Doc. No. 2367 at 25.) Feig does not identify any evidence of record disputing Brister's account of the Government's investigation to determine the extent and location of Weiss's assets or indicating that the Government could have sought the forfeiture of the Viola Road and Concord Drive properties any sooner than it did. Thus, there was no error in citing Brister's declarations to refute Feig's claim that the Government unlawfully delayed seeking forfeiture of the Viola Road and Concord Drive properties.

■ Magistrate Judge Spaulding further noted that Feig's assertion of her Fifth Amendment privilege against self-incrimination during a civil deposition indicated that Feig had opportunities to advance the issue of her ownership of Viola Road prior to the instant forfeiture proceeding but failed to do so. (Doc. No. 2367 at 25–26.) Feig does not contest the Magistrate Judge's reference to Feig's assertion of the Fifth Amendment privilege, only that there is "no evidence to support the supposition that Petitioner's invocation of her Fifth Amendment privilege stymied the Government's efforts to locate and identify the Viola Road property or the Concord Drive property." (Doc. No. 2371 at 7–8.)

The Government and the Receiver for National Heritage Life Insurance Company attempted to locate Weiss's assets for more than a decade, and Feig was deposed

---

**3.** Pursuant to Federal Rule of Criminal Procedure 32.2(e)(1)(B), the court may "at any time" amend an existing order of forfeiture to include substitute property that qualifies for forfeiture.

**4.** Feig also contends that "most of [Brister's testimony] is hearsay." (Doc. No. 2372 at 5–6.) The Court need not address this objection

because Feig has not specifically identified any alleged hearsay statements of Brister cited in the Report and Recommendation. *See Macort,* 208 Fed.Appx. at 783 (requiring a party challenging a report and recommendation to file written objections specifically identifying the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection).

on October 23, 2004 in furtherance of that purpose. (Doc. No. 2132 ¶¶ 11, 16.) During that deposition, Feig asserted her Fifth Amendment privilege when asked who had been paying the expenses for the upkeep of the Viola Road property. (Doc. No. 2309–1 ¶ 37.) Feig also asserted her Fifth Amendment privilege with respect to questions regarding Weiss's transfer of Viola Road to her. (Doc. No. 2132 ¶ 16.) Although Feig "now feels her assertion of privilege under the Fifth Amendment was made in error based upon poor advice of counsel," (Doc. No. 2309–1 ¶ 37), the fact remains that she failed to answer questions regarding control of the Viola Road property in 2004. Finding no other arguments by Feig on this matter, the Magistrate Judge did not err in finding that Feig contributed to the delay in the forfeiture proceedings by asserting her Fifth Amendment privilege against self-incrimination. Accordingly, for the reasons set forth in the Report and Recommendation, any delay by the Government in seeking the forfeiture of the Viola Road and Concord Drive properties does not weigh in favor of finding a violation of Feig's due process rights. (Doc. No. 2367 at 25–26.)

### B. Timeliness of Feig's Assertion of Rights in the Properties

In finding that Feig contributed to the delay of the Government seeking forfeiture of the Viola Road and Concord Drive properties, the Magistrate Judge reasoned that "Feig had the opportunity to explain the circumstances under which she acquired Viola Road as early as 1993, but she declined to do so." (Doc. No. 2367 at 26.) Feig argues that this statement is factually incorrect because Feig answered every question put to her in depositions given in 1994 and 2003. (Doc. No. 2372 at 6–7.) The fact that Feig answered all of the questions propounded upon her during those depositions, without more, does not suggest that Feig was unable to disclose at any time how she acquired the Viola Road property.

Feig also objects to the Magistrate Judge's reasoning that Feig's repeated delays during the instant forfeiture proceeding weighed against finding that Feig has been prejudiced by any delays in attempted forfeiture of the Viola Road and Concord Drive properties. (Doc. No. 2372 at 8–9; Doc. No. 2367 at 26.) Feig's several requests for extensions of time in the instant forfeiture proceeding are not fatal to her argument that the Government's nine-year delay in seeking the forfeiture of the Viola Road and Concord Drive properties violated her due process rights. However, Feig does not cite, and the Court has not found, any authority suggesting that the Magistrate Judge erred by citing Feig's repeated requests for extensions of time as evidence of delay by Feig in asserting her rights to the Viola Road and Concord Drive properties. (Doc. No. 2367 at 26.) Accordingly, the Court adopts the Magistrate Judge's assessment that Feig's failure to timely assert her ownership interests weighs against finding a violation of Feig's due process rights.

### XII. Standing to Challenge Preliminary Order of Forfeiture of Substitute Assets

In the Report and Recommendation, the Magistrate Judge found that Feig lacked standing to challenge the preliminary order of forfeiture of substitute assets. (Doc. No. 2367 at 29–30.) Feig now objects to that finding. (Doc. No. 2372 at 10–11.)

"[P]reliminary orders of forfeiture, ... when entered by a district court, 'authorize[ ] the government to seize the specific property subject to forfeiture and to commence proceedings that comply with any statutes governing third-party rights.'" *United States v. Cone*, 627 F.3d

1356, 1358 (11th Cir.2010) (quoting *United States v. Petrie,* 302 F.3d 1280, 1284 (11th Cir.2002)). The exclusive procedures by which a non-party may vindicate untainted property interests before the forfeiture becomes final are provided in 18 U.S.C. § 1963(*l* ) and Federal Rule of Criminal Procedure 32.2. *See Gilbert,* 244 F.3d at 910 ("[I]t is clear that Congress intended section 1963(*l* ) proceedings to provide the exclusive means for third-parties to assert their claims to forfeited property.").

Section 1963(*l* )(2) provides that a non-party "may ... petition the court for a hearing to adjudicate the validity of his alleged interest in the property," not to dispute the finding that the defendant's interests in the property are subject to forfeiture. Further, Section 1963(*l* )(6) limits the grounds upon which a third-party petitioner may rely to establish his interest in the property, and the invalidity of the underlying preliminary order of forfeiture is not one of those grounds. *Gilbert,* 244 F.3d at 911.

 Like the analogous criminal forfeiture statute in 21 U.S.C. § 853(n), "[n]owhere do the provisions [of Section 1963] grant petitioners a private cause of action or right to appeal a court's ruling outside of an ancillary forfeiture proceeding." *Cone,* 627 F.3d at 1358. Simply put, "the jury's special verdict of forfeiture establishes the extent of the defendant's interest in a certain forfeitable asset." *Gilbert,* 244 F.3d at 911. Therefore, third-party claimants may not challenge the forfeitability of the defendant's interest in the subject assets embodied in the preliminary order of forfeiture. *See, e.g., United States v. Muckle,* 709 F.Supp.2d 1371, 1374 (M.D.Ga.2010) ("Because the ancillary proceeding affords the exclusive opportunity for third parties to assert any ownership interest that would require amendment of a preliminary order of forfeiture, 'a third party has no right to challenge the prelimi-

nary order's finding of forfeitability.' " (quoting *United States v. Andrews,* 530 F.3d 1232, 1236 (10th Cir.2008))). Accordingly, Feig is limited to the statutory bases for demonstrating a superior interest in the property set forth in 18 U.S.C. § 1963(*l* )(6).

## XIII. Summary

In summary, all of Feig's objections to the Report and Recommendation denying her Motion for Summary Judgment are overruled. With respect to the Government's objections to the Report and Recommendation, the Court finds that Feig lacks standing to challenge the forfeiture of the Concord Drive property. The remainder of the Government's objections to the Report and Recommendation are overruled.

### Conclusion

Based on the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1) The Objections to Report and Recommendation by Petitioner Goldie Feig (Doc. No. 2372) are **OVERRULED.**

2) The Objections to Report and Recommendation by the United States of America (Doc. No. 2371) are **SUSTAINED in part** and **OVERRULED in part.** Petitioner Goldie Feig lacks standing to challenge to the forfeiture of 65 East Concord Drive, Monsey, New York, and that portion of her Petition for Innocent Ownership (Doc. No. 2251) is **DISMISSED.** The Objections of the Government are **OVERRULED,** and the Report and Recommendation of the United States Magistrate Judge (Doc. No. 2367) is **AFFIRMED** in all other respects.

REPORT AND RECOMMENDATION

KARLA R. SPAULDING, United States Magistrate Judge.

TO THE UNITED STATES DISTRICT COURT

This cause came on for consideration without oral argument on the following motions filed herein:

MOTION: UNITED STATES OF AMERICA'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 2327)

FILED: January 31, 2011

MOTION: PETITIONER GOLDY FEIG WEISS'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 2329)

FILED: January 31, 2011

## I. PROCEDURAL HISTORY.

On April 29, 1998, Sholam Weiss (Weiss) was charged in a ninety-three count indictment with racketeering, mail fraud, money laundering, false and fraudulent statements and obstruction of justice arising out his dealing with National Heritage Life Insurance Company (NHL). Doc. No. 1. After a nine month trial, on November 1, 1999, a jury convicted Weiss and others of multiple counts of fraud, including convictions under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et. seq. (RICO). Doc. No. 1267. The next day, the jury returned a Special Verdict of Forfeiture and forfeited several items of property, money judgments totaling $57,213,591.46, and Weiss's interest in Windsor Plumbing Supply Company, Inc. (Windsor) which the jury found had served as an instrument for his criminal acts. Doc. No. 1276.

On January 19, 2009, this Court entered a Preliminary Order of Forfeiture for Substitute Assets belonging to Weiss in partial satisfaction of the outstanding forfeiture money judgments. The substitute assets in the order include real properties located at 255 Viola Road, Monsey, New York (Viola Road) and 65 East Concord Drive, Monsey, New York (Concord Drive). Vio-

la Road and Concord Drive are each titled in the name of Weiss's wife, Goldie Weiss–Feig (Feig).[1] Doc. 2137.

On November 24, 2009, Feig filed a Petition of Innocent Owner to exclude Viola Road and Concord Drive from forfeiture because they belonged to her and not her husband. Doc. 2251. The Petition alleges that Weiss transferred Viola Road to Feig after they formally separated on October 26, 1989, and since then, only she and her children have resided there. Id. ¶¶ 2, 3–6. In support, Feig relied only on a signed separation agreement as the consideration for the Viola Road transfer. Id. ¶ 2. The Petition further alleges that Feig, not Weiss, purchased Concord Drive for $290,000 so that her parents could reside there after moving to the United States. Id. ¶ 8.

The United States seeks summary judgment based on its assertion that Feig lacks standing to contest the forfeiture of Weiss's interest in Viola Road and Concord Drive. Doc. No. 2327. The United States filed a statement of uncontested material facts and evidence in support of its motion. Doc. No. 2328. Feig responded to the United States' motion for summary judgment and filed a separate response to the statement of uncontested facts and supporting evidence. Doc. Nos. 2339, 2440. The United States replied to both of Feig's responses. Doc. Nos. 2345, 2346.

Feig also filed a motion for summary judgment based on Feig's assertion that the delay in the prosecution of the forfeiture action against her violated her due process rights, violated the equitable doctrine of laches, and that the preliminary order of forfeiture was not supported by evidence. Doc. No. 2329. Feig filed a statement of facts and evidence in support

1. Feig's name is spelled in various ways in the record. References to Feig shall include Goldie Weiss–Feig, Goldie Feig Weiss, Goldy Weiss and all other variations of Feig's name.

of her motion. Doc. No. 2330. The United States responded to Feig's motion. Doc. No. 2338. Feig filed a reply and an affidavit in reply to the United States' response. Doc. Nos. 2343, 2344, 2348, 2349.

## II. STATEMENT OF MATERIAL FACTS.

### A. *Admissibility of Affidavits and Declarations.*

In its reply to Feig's response to the United States' statement of material facts, the United States objected to the affidavits submitted by Feig, Weiss, Solomon Unsdorfer, Leo Fox an the affirmation by Donald Swords. Doc. No. 2345. The Court will consider the United States' arguments regarding the validity of each sworn statement to the extent that it is material to resolution of the pending motions.

Sholam Weiss incorporated Windsor Plumbing Supply, Inc. (Windsor) and was its president and sole shareholder. Doc. No. 2328–1 at 4. In 1975, Weiss married Feig. Doc. 2309–1 at 1. On July 21, 1988, Weiss purchased Viola Road, taking title in his name only. Doc. Nos. 2328–3 at 1; 2328–4 at 3. Feig has lived at Viola Road since that time. Doc. No. 2328–5 at 3 (transcript page 8, lines 21–25).

### B. *Weiss' Financial Troubles.*

On February 5, 1988, Weiss guaranteed, in two transactions, a $5 million loan to Windsor from First Jersey National Bank, which was secured by mortgages on Windsor's property. Doc. No. 2328–6 at 2–6. On November 28, 1988, CofaCredit, S.A. sued Weiss and Windsor for fraud, conspiracy and civil RICO. *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.,* 187 F.3d 229 (2d Cir.1999). On January 3, 1989, Societe Generale sued Weiss and Windsor for breach of contract. Doc. No. 2328–9. In May of 1989, Weiss mortgaged the Viola Road property for $250,000.00 in favor of Moshe Mishal. Doc. No. 2328–11.

In June of 1989, Weiss personally guaranteed a $3.5 million promissory note that Windsor executed in favor of Seward Company. Doc. No. 2328–12 at 5 (transcript page 230, lines 6–18).

On August 17, 1989, Weiss filed a satisfaction of the Mishal mortgage on Viola Road which showed a payment of $300,000. Doc. No. 2328–13. On the same day, Weiss took out another mortgage on Viola Road in the amount of $390,000 from Williamsburg Savings Bank. Doc. No. 2328–14.

On January 23, 1990, Windsor's creditors filed an Involuntary Petition for Bankruptcy of Windsor. Doc. No. 2328–1 at 4 ¶ 2. On March 9, 1990, a deed was filed in New York public records in which Weiss transferred title to Viola Road to Feig. Doc. No. 2328–20. On behalf of Windsor, Weiss filed a Chapter 11 Voluntary Petition, converting the involuntary Chapter 7 bankruptcy to a Chapter 11 bankruptcy on March 21, 1990. Doc. No. 2328–1. The petition listed seventeen pending actions against Windsor and Weiss, and indicated that the bankruptcy involved $18 million in liabilities. Doc. No. 2328–1 at 3, 11–12.

Feig testified that she did not have conversations with Weiss about how much money they had or other financial decisions. Decisions regarding financial matters were always made by Weiss. Doc. No. 2328–5 at 9 (transcript page 31, lines 18–24). She did not know how much money Weiss made, and they never spoke about Weiss's business or assets. *Id.* at 13 (transcript page 49, lines 3–9).

### C. *Viola Road and the Separation Agreement.*

#### 1. *Creation of the Separation Agreement.*

The record contains a document entitled "Separation Agreement." Doc. No. 2328–

30. Pursuant to that document, Weiss transferred Viola Road to Feig. *Id.* ¶ 2. Weiss agreed to pay Feig $14,000 per month in support and to continue to pay the mortgage on the Viola Road property. *Id.* ¶ 6. Weiss agreed to pay $1,000 per month in child support for each of his children, for a total of $4,000 or $5,000 per month. *Id.* ¶ 8; Doc. No. 2340–1 ¶ 2 (Feig and Weiss have four children); Doc. No. 2340–5 at 1, 11–12 (Feig and Weiss have five children). Weiss also agreed to provide each child with a bar mitzvah or wedding at his expense in a manner consistent with the bar mitzvah which had already been held for the eldest son. *Id.* ¶ 8(a). The agreement did not list any personal property to be disposed of nor did it list any marital debts. *Id.* at 12–13.

The Receiver for National Heritage Life Insurance Company deposed Feig on December 18, 2003. Doc. No. 2132–2. ¶ 16. During the deposition, Feig testified that she did not read the Separation Agreement, did not have legal representation for the agreement, and did not discuss the provisions of the agreement with Weiss. *Id.* She also stated in response to numerous questions regarding the Separation Agreement that she did not remember the circumstances regarding the signing of that agreement. Doc. No. 2338–1.

In a deposition taken in the present case in 2010, Feig testified that her father and a three rabbi tribunal determined the terms of the Separation Agreement which would allow Feig and her children to continue living in their home. Doc. No. 2340–1 ¶ 7. She did not take part in negotiating the terms of the Separation Agreement because that was not her religious custom. *Id.* Feig testified that she did not want a divorce, referred to as a "get" (the Jewish divorce document), because she was young and divorce was not favored in her religious community. *Id.* ¶ 8.[2]

The Separation Agreement bears the notary public stamp of Jan R. Schneiderman and purported signatures of Schneiderman attesting to the execution of the Separation Agreement before her by Weiss on October 5, 1989, and by Feig on October 26, 1989. *Id.* at 11. Schneiderman testified in a civil case in 1992 that she drafted the Separation Agreement based on a list of terms previously agreed upon that were provided to her. She further testified that Feig came to her office to sign the Agreement. Doc. No. 2340–8 at 33 (transcript page 17, lines 10–19, and page 19).[3]

On February 1, 2004, Feig testified during a deposition in a civil case that she signed the Separation Agreement at Schneiderman's office in Manhattan, Doc. No. 2340–5 at 15 (transcript page 8, lines 7–16). On October 27, 2004, Feig testified during a deposition in another civil case that she did not remember the circumstances regarding the signing of the Separation Agreement. Doc. No. 2338–1 (transcript page 10, lines 4–16).[4] Most re-

---

**2.** In a belatedly submitted affidavit, Weiss averred that Feig's father retained the services of Rabbi Unsdorfer and two other rabbis to negotiate the terms of the Separation Agreement. Doc. No. 2349–1 ¶ 12; *accord* Affidavit of Salomon Unsdorfer, Doc. No. 2348–1 ¶ 2. He attested that he asked Attorney Leo Fox to advise him about drafting the formal Separation Agreement. Fox introduced him to Attorney Donald Swords who prepared the initial draft of the Separation Agreement. *Id.* ¶ 16. After Swords became ill, Fox introduced Weiss to Jan Schneider-

man, who finalized the Separation Agreement. *Id.* ¶¶ 17, 19.

**3.** The United States argues that the Court cannot consider Schneiderman's testimony from 1992 for the truth of the matter asserted because Schneiderman has now recanted that testimony. Which version of her prior statements Schneiderman will adopt if this matter proceeds to trial is a question that the Court cannot resolve on summary judgment.

**4.** On October 23, 2004, in yet another civil case, Feig refused to answer questions regard-

cently, Feig averred that she cannot recall in detail signing the Separation Agreement. Doc. No. 2340–1 ¶ 6 (2011 Feig Affidavit).

In a declaration signed in October 2010, Schneiderman attested that Weiss first approached her about preparing a separation agreement in early 1990 in order to protect his assets. Doc. No. 2328–29 ¶ 7. She further averred that Weiss instructed her to back-date the agreement so that it would precede the Windsor bankruptcy proceeding. *Id.* ¶ 11. Schneiderman also declared that sometime in March 1990, Weiss brought her the completed Separation Agreement bearing signatures that purported to be those of Weiss and Feig. Schneiderman refused to notarize Feig's signature because she was not present. *Id.* ¶ 24. She further attested that the signatures on the Separation Agreement purporting to notarize the document are not hers and that she did not affix her notary stamp on the documents. *Id.* ¶¶ 30–31. She declared that she lied about these matters in the civil deposition she gave in 1992. *Id.* ¶ 34.[5]

2. *Weiss's Connection with Viola Road after the Separation Agreement.*

Feig averred that after their separation, Weiss only came home to see his children on the Jewish Sabbath and on Jewish holidays. Doc. No. 2340–1 ¶ 5 (2011 Feig Affidavit). She attested that Weiss may have occasionally left some personal effects at Viola Road because he would " 'keep up appearances' for the sake of [the] children by sitting at the head of the dinner table ... and playing the host when guests were present." *Id.* ¶ 9. He continued to help provide for their family, help

with decisions associated with their children, and provide financial support. *Id.* ¶ 10. Feig cooperated with Weiss in mortgaging the Viola Road property. Doc. No. 2340–1 ¶ 11. She attested, however, that she and Weiss "remained separated." *Id.* ¶ 9. Weiss confirmed Feig's testimony about their relationship in his affidavit. Doc. No. 2349–1 ¶¶ 23, 26, 29, 30.

In her 2010 declaration, Schneiderman attested that while Weiss had apartments in Manhattan at various times, his true residence was Viola Road. Doc. No. 2328–29 ¶ 37. Schneiderman visited Weiss at the Viola Road property several times and noted that he shared a bedroom with his wife; that his wife brought his clothes to the dry cleaner; that his personal items were visible throughout the house; and that he maintained a fully-furnished, newly built home office there. *Id.* ¶ 39. Schneiderman also paid phone bills and may have paid for improvements to the Viola Road property from money she was holding for Weiss. Doc. No. 2328–31 at 28–29 (transcript page 111, line 23 through transcript page 115, line 5). Jan Stark also testified that Weiss was very involved in the Viola Road residence and neighborhood after the Separation Agreement, and that he observed Weiss stay overnight in the house during the week. Doc. No. 2328–32 at 10–12 (Jan Stark Depo. transcript pages 38–46).

D. *Concord Drive Property.*

In 1994, Feig's parents wanted to move to the United States to be closer to Feig and her sister. Doc. No. 2340–1 ¶ 13. Schneiderman averred the Weiss told her that he planned to purchase a home for

---

ing who was paying the expenses for Viola Road, asserting her Fifth Amendment rights. Doc. No. 2309–1 ¶ 37. Feig now contends that her assertion of the Fifth Amendment privilege was "made in error based upon poor

advice of counsel." *Id.; see also* Doc. No. 2328–5 (transcript page 105, lines 12–25).

5. Weiss averred that Schneiderman "signed and duly notarized the signatures on the agreement." *Id.* ¶ 21.

Feig's parents, Doc. No. 2328–29 ¶ 41, but Weiss attested that he did not make this statement and did not help in purchasing a home for Feig's parents, Doc. No. 2349 ¶ 33.[6] Feig and her sister, Sylvie Weiss, testified that their parents purchased Concord Drive, although their recollection of the events differ in some respects.

Sylvie Weiss (Sylvie) testified in a deposition taken on January 5, 2011. Doc. No. 2340–9. She averred that her husband first observed that Concord Drive was for sale. Sylvie called her parents, who said they would sell their house in Belgium and buy the Concord Drive property. *Id.* at 28. Her father instructed Sylvie to pick up money he transferred for the purchase of the house. *Id.* at 29. She picked up closed envelopes from a friend of her father that contained the payment and gave them to Mr. Burnbaum, the attorney handling the closing. *Id.* at 30–31. Her real estate broker told her to use this lawyer. *Id.* at 31. The house was titled in Feig's name because their parents were not American citizens and they were not in the United States to sign the necessary papers. *Id.* at 32, 34–35. After the house was purchased, Sylvie and her husband hired contractors to renovate the house. Sylvie's father sent about $30,000 to pay for the renovations, and Sylvie paid the contractors. *Id.* at 40–41. Feig was involved in helping to plan the renovation of the kitchen and other designing. *Id.* at 42. After the parents moved into the Concord Drive property the bills for the house came to that address. *Id.* at 48.

In a deposition taken on October 19, 2010, Feig testified that she picked out Concord Drive, Doc. No. 2328–5, at 30 (transcript page 115, lines 18–22), but in her 2011 affidavit she averred that she picked out the home with her sister, Doc. No. 2340–1 ¶ 13. The purchase money came from her father. Doc. No. 2328–5 at 30 (transcript page 116, lines 5–6). She did not recall how the money was received. *Id.* (transcript page 116, lines 9–19). She did not recall whether the money was given to Mr. Burnbaum, the lawyer. *Id.* at 31 (transcript page 119, lines 16–18). Feig's father gave her money and asked her to renovate the house. *Id.* (transcript page 121, lines 2–4). Feig averred that the bills for the Concord Drive home are sent to Viola Road, and Feig pays the bills from money her mother receives from the German and Belgian governments, *Id.* ¶ 15, or sometimes from money provided by Weiss, Doc. No. 2328–5 at 38 (transcript page 146, lines 14–15; transcript page 147, lines 1–7).

In 1997, Weiss mortgaged Concord Drive for $210,000. Doc. No. 2340–1 ¶ 16. Feig admitted that her handwriting was on portions of the loan documents, but she has no recollection of applying for a mortgage loan on Concord Drive. Doc. No. 2328–5 at 33–34 (transcript page 127, lines 1 through page 128, line 24; transcript page 130, lines 16–25). Feig attested that she never would have agreed to mortgage her parents' home and that Weiss "falsified the necessary documents and forged the necessary signatures." *Id.* Feig also testified that she was not aware that Weiss disbursed the proceeds from the mortgage for his own benefit. Doc. No. 2340–1 ¶ 17. Weiss attested that Feig was not aware of the mortgage on the Concord Drive property, and that Schneiderman helped him to forge the necessary signatures to obtain the mortgage loan. Doc. No. 2349–1 ¶ 37.

---

**6.** Feig objects that statements Weiss made to Schneiderman are inadmissible hearsay. The United States contends that the Court should consider the evidence, striking it only if the Court finds that Feig was not acting as Weiss's nominee. The Court need not resolve this evidentiary issue to render a decision on the United States' motion for summary judgment.

The loan proceeds in the amount of $200,122.35 were paid in a check dated March 20, 1997 issued to Feig. Doc. No. 2328–41. On March 24, 1997, $200,122.35 was deposited into the bank account of Feig and Sylvie Weiss. Doc. No. 2328–41. A check in the amount of $100,000.00 was written from that account to Leo Fox on March 26, 1997, which check bears the signature "Goldie Weiss." Doc. No. 2328–43. Feig testified that she had no knowledge regarding what was done with the proceeds of the mortgage. Doc. No. 2328–5 at 34 (transcript page 131, lines 9–16). Sylvie Weiss also testified that she was not aware of the deposit into her joint bank account with Feig or the check issued to Fox. Doc. No. 2328–33 at 13 (transcript pages 51, lines 14–25, and 52, lines 1–25). Weiss testified that he "deceived" Feig to cause her to write the check to Fox by leading her to believe that he had directed money from a business deal into her account for her support. Doc. No. 2349–1 ¶ 37.

In 2003, the mortgage on Concord Drive was refinanced. Doc. No. 2328–44. The refinancing documents bear the initials "GF," and the signature "Goldie Feig." *Id.* Feig testified that she sought the refinancing on Concord Drive in order to lower the payment. Doc. No. 2328–5 at 36 (transcript page 139, lines 5–25, page 140, lines 1–19, page 143, lines 7–15 [7]).

## III. APPLICABLE LAW.

### A. *Forfeiture.*

"Any person, other than the defendant, asserting a legal interest in the property which has been ordered forfeited to the United States," may petition the court for a hearing to adjudicate the validity of the alleged interest. 18 U.S.C. § 1963(*l*)(2). The ancillary proceeding creates an orderly procedure whereby third parties who claim their property interests have been forfeited in a criminal case can challenge the validity of the forfeiture order and establish their legitimate ownership interest. *See United States v. Marion,* 562 F.3d 1330, 1336 (11th Cir.2009). The only issue in an ancillary proceeding is ownership of the property ordered forfeited in the criminal case. *United States v. Gilbert,* 244 F.3d 888, 911 (11th Cir.2001). To warrant an amendment to the forfeiture order, the third party petitioner must demonstrate a right, title, or interest in the property sufficient to trump that of the United States. 18 U.S.C. § 1963(*l*)(3) & (6); *see also Gilbert,* 244 F.3d at 911.

Third parties can challenge the forfeiture of their claimed interest by demonstrating either that they have legal interests superior to the defendant's or that they are bona fide purchasers for value. 18 U.S.C. § 1963(*l*)(6); 21 U.S.C. § 853(n)(6) (adopting same standard as § 1963(*l*)(6)); *Libretti v. United States,* 516 U.S. 29, 44, 116 S.Ct. 356, 133 L.Ed.2d 271 (1995) (third parties limited in manner in which they can challenge forfeiture); *United States v. Kennedy,* 201 F.3d 1324, 1328 (11th Cir.2000) (third party asserting interest in criminally forfeited property limited to showing superior title or status as bona fide purchaser for value).

Ancillary forfeiture proceedings which arise out of criminal cases are civil in nature and are thus governed by the Federal Rules of Civil Procedure. *See Gilbert,* 244 F.3d at 907. Accordingly, the parties may move for summary judgment under Federal Rule of Civil Procedure 56. *See* Fed. R. Crim. P. 32.2(c)(1)(B).

### B. *Summary Judgment.*

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate "if

---

7. While Feig initially testified that she refinanced Viola Road, she clarified her testimony to indicate that the refinancing was of Concord Drive.

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Supreme Court explained the rule as follows:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party.... If material issues of fact exist, the Court must not decide them, but rather, must deny the motion and proceed to trial." *Kitchings v. Fl. United Methodist Children's Home, Inc.,* 393 F.Supp.2d 1282, 1291 (M.D.Fla. 2005) (internal citations omitted).

" 'Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant. For factual issues to be considered genuine, they must have a real basis in the record.' ... For instance, mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England,* 432 F.3d 1321, 1325–26 (11th Cir. 2005) (quoting *Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739, 742 (11th Cir.1996)).

## IV. ANALYSIS.

### A. *The United States' Motion for Summary Judgment—Standing.*

The United States asserts that Feig does not have standing to contest the forfeiture of either Viola Road or Concord Drive. Third-party claims contesting a preliminary order of forfeiture under 18 U.S.C. § 1963(*l*)(2) can be filed only by parties who have a "legal interest" in the forfeited property. *United States v. Weiss,* No. 6:98–cr–99–ORL19KRS, 2005 WL 1126663, at *10–11 (citing *United States v. Gilbert,* 244 F.3d 888, 910 (11th Cir.2001)). Section 1963(*l*) limits the grounds upon which a third-party petitioner may rely to establish an interest in property. *Id.*

In order to establish a legitimate entitlement to property, the petitioner must demonstrate that "(1) title to the property was vested in him rather than the defendant at the time of the act which made the property subject to forfeiture; (2) his title to the property was superior to the title held by the defendant at the time of the act which made the property subject to forfeiture; or (3) that he purchased his interest without reasonable cause to know that the property was subject to forfeiture." *Id.* "A claimant need not own the property in order to have standing to contest its forfeiture; a lesser property interest, such as a possessory interest, is sufficient for standing." *United States v. $38,000 in U.S. Currency,* 816 F.2d 1538, 1544 (11th Cir. 1987).

### 1. *Viola Road.*

#### a. **Feig as Nominee.**

The United States first argues that Feig was a nominee of Weiss and therefore lacks standing. "[A] person or entity cannot have a vested interest in property if that person or entity is found to be acting as a nominee for someone whose property is subject to forfeiture." *Weiss,* 467 F.3d at 1308–09. In deciding true ownership, courts look beyond who possesses bare legal title to property; the crucial issue is who exercises dominion and control. *See United States v. One 1990 Beechcraft, 1900 C Twin Engine Turbo–Prop Aircraft,* 619 F.3d 1275, 1278 (11th Cir.2010) ("a claimant must be more than a 'nominee who exercises no dominion and control'"); *United States v. A Single Family Residence and Real Property Located at 900 Rio Vista Blvd., Ft. Lauderdale,* 803 F.2d 625, 630 (11th Cir.1986); *United States v. McCorkle,* 143 F.Supp.2d 1311, 1321 (M.D.Fla.2001).

Feig presented evidence that the Viola Road house was transferred to her pursuant to the Separation Agreement. A deed transferring Viola Road to her was filed in New York public records in 1990. She has continually lived in the Viola Road house with her family.

The United States urges the Court to look behind the formal legal title to the property and to consider the evidence that, it contends, shows that the Separation Agreement which conveyed ownership of the Viola Road property to Feig was a sham. Weiss admitted during the criminal trial that he previously used nominees. Doc. No. 2328–45 at 3 ("But to a bank or someone who had a judgment against me, I was trying to hide out.... I would say it's Jan Starr, he was my nominee."). The evidence also shows that at the time the Separation Agreement was drafted and signed (whether 1989 or 1990), Weiss had ample incentive to fraudulently transfer assets to shield them from his creditors.

The terms of the Separation Agreement also support the United States' theory. Under that agreement, Weiss purported to transfer the Viola Road property to Feig and promised to make exorbitant payments to Feig and their children. While Feig and the children continued to live in the house, the United States presented evidence that Weiss kept personal belongings in the house and that he was involved in matters related to upkeep of the house, including a newly built home office. He provided money to pay the bills on the home. He continued to reside in the house from time to time.

Feig averred, however, that after their separation, Weiss only came home to see his children on the Jewish Sabbath and on Jewish holidays. Doc. No. 2340–1 ¶ 5 (2011 Feig Affidavit). She attested that Weiss may have occasionally left some personal effects at Viola Road because he would " 'keep up appearances' for the sake of [the] children by sitting at the head of the dinner table ... and playing the host when guests were present." *Id.* ¶ 9. He continued to help provide for their family, help with decisions associated with their children, and for financial support. *Id.* ¶ 10.

Feig's affidavit is sufficient to raise a credibility issue regarding the extent to which Weiss exercised dominion and control over Viola Road after the Separation Agreement and deed transferred legal title to Viola Road to Feig. The undisputed facts, taken in the light most favorable to Feig, are insufficient to establish that Feig acted as a nominee of Weiss with respect to Viola Road.

#### b. **Validity of the Separation Agreement.**

The United States asserts that the Separation Agreement is not valid and should

be set aside because (1) it does not comply with New York Law, (2) it violates the New York Uniform Fraudulent Conveyance Act (UFCA), New York Debtor & Creditor Law (D.C.L.) § 276, and (3) the terms of the agreement "evidence overreaching, fraud, duress or a bargain so inequitable that no reasonable or competent person would have consented to it," *Curtis v. Curtis*, 20 A.D.3d 653, 654, 798 N.Y.S.2d 764 (N.Y.App.Div.2005). State law determines Feig's interest in Viola Road. *See United States v. Hovind*, No. 3:06cr83/MCR, 2009 WL 2369340 (N.D.Fla. July 29, 2009) (citing *United States v. Fleet*, 498 F.3d 1225, 1231 (11th Cir.2007)).

### i. *Improper Acknowledgment.*

The United States contends that the Separation Agreement is not valid because it was not properly acknowledged. The United States relies on *Garguilio v. Garguilio*, 122 A.D.2d 105, 504 N.Y.S.2d 502 (N.Y.App.Div.1986), and New York Domestic Relations Law § 170(6) in support of this argument. *Garguilio* was a matrimonial action in which the husband relied on a separation agreement to establish that he had lived separate and apart from his wife for one or more years. The court found that the husband failed to offer sufficient proof of the separation agreement because their was no showing that the separation agreement was acknowledged in the form required by section 170(6), a statute that sets forth the basis for actions for divorce in New York. *Id.* at 503.

The evidence is undisputed, however, that Weiss and Feig were not seeking to proceed in an action for divorce. The United States has not shown that simply because the Separation Agreement may not have been sufficient to support an action for divorce it was null and void for all purposes. Even if the statutory requirements for a separation agreement govern the validity of the agreement for purposes other than an action in divorce, the evidence is disputed regarding whether and when Feig signed and Schneiderman notarized the signatures on the Separation Agreement.

### ii. *New York UFCA and Reasonableness of the Separation Agreement.*

The United States also contends that the Separation Agreement (and deed of transfer) violate the New York UFCA and, therefore, that the transfer of Viola Road is voidable. Some courts have found that a claimant lacks standing to contest a forfeiture action when her interest in the property is the result of a transfer that violates applicable state fraudulent transfer laws. *See United States v. Real Property Located at 5208 Los Franciscos Way*, 385 F.3d 1187, 1192–93 (9th Cir.2004); *United States v. Gallion*, No. 2:07–39–S–DCR, 2010 WL 3620257, at *21 (E.D.Ky. Sept. 10, 2010). It is not clear, however, that the United States Court of Appeals for the Eleventh Circuit would adopt the rationale that a court in a criminal ancillary forfeiture proceeding should determine in the first instance whether the transfer of the property at issue is voidable because the transfer violated a UFCA.

Even assuming that the Eleventh Circuit followed the rationale in *5208 Los Franciscos Way* and *Gallion*, the undisputed evidence is insufficient to establish that the transfer of Viola Road violated the New York UFCA. New York law provides that a transfer is fraudulent if it is made with "actual intent ... to hinder, delay, or defraud either present or future creditors." N.Y.D.C.L. § 276. The elements of a fraudulent conveyance claim under section 276 are: (1) the transfer of property; (2) which had value out of which creditors could have realized a portion of their claim for damages; and (3) actual intent to defraud on the part of the transferor and the transferee. *In re Kovler*, 249 B.R. 238, 247–48, 243 (S.D.N.Y.Bankr.2000).

The *Kovler* court reiterated that "mutual fraudulent intention on the part of both parties to the transaction is required in order to invoke the protection of the law prohibiting fraudulent conveyances; fraudulent intent on the part of one of the parties is insufficient." *Id.*

The United States urges the Court to look for "badges of fraud" as circumstantial evidence of actual intent to defraud by both Weiss and Feig, including the following: (1) the close relationship among the parties to the transaction; (2) a secret and hasty transfer not in the usual course of business; (3) inadequacy of consideration; (4) the transferor's knowledge of a creditor's claim and his inability to pay for it; (5) the use of dummies or fictitious parties; and (6) the transferor retaining control of the property after the conveyance. *In re Kovler*, 249 B.R. at 244–45. Depending on the context, these badges of fraud will vary in significance. *MFS/Sun Life Trust— High Yield Series v. Van Dusen Airport Serv. Co.*, 910 F.Supp. 913, 935 (S.D.N.Y. 1995). Even if for purposes of this motion only, the Court assumes that these criteria are met as to Weiss, they still have to be met as to Feig pursuant to New York law.

The United States contends that constructive knowledge of the fraud can be attributed to Feig because she was aware of circumstances which should have led her to make an inquiry but she did not do so, citing *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 636 (2d Cir.1995). The United States asserts Feig knew or should have known that Weiss was transferring Viola Road to her for the purpose of hindering his creditors. *In re Corcoran*, 246 B.R. 152, 161 (E.D.N.Y.Bankr.2000). Feig has denied any knowledge of Weiss' business dealings and finances, even as regarding her home and housing expenses. Weighing the circumstances in which Feig accepted the conveyance of the property against her testimony that she did know of Weiss' intent or debts will require a credibility determination. Therefore, there is a genuine issue of material fact regarding Feig's knowledge and intent regarding the transfer of Viola Road.

Accordingly, the United States' motion for summary judgment based on Feig's lack of standing regarding the Viola Road property should be **DENIED**.

### 2. *Concord Drive.*

The United States asserts that Feig does not have standing to assert a claim for Concord Drive on two alternative theories: first, that Feig is only the nominal title holder of the property who has not exercised dominion and control over it; and second, that Feig acted as Weiss' nominee as to Concord Drive. As previously noted, Feig has the obligation of presenting facts showing that she has standing to assert a claim for the Concord Drive property.

Feig presented evidence that Concord Drive was purchased with money furnished by her father, that her parents resided in the home, and that Concord Drive is titled in her name. Feig's father died two years after he moved into Concord Drive. Doc. No. 2340–1 ¶ 14. After her father's death, Feig's mother continued to live at Concord Drive. Feig and her sister took care of the bills using money provided by their mother. Weiss also provided her funds to pay bills for the property. In 2003, Feig decided, on the advice of one of her sons, to refinance the mortgage on Concord Drive because the payments were too high.

The United States asserts that because Weiss often concealed his money in assets owned by nominees, the Court should credit Schneiderman's testimony that Weiss said he would buy a house for Feig's parents. The United States argues that the inconsistent testimony of Feig and Sylvie Weiss regarding the transfer and re-

ceipt of funds used to purchase Concord Drive, Weiss's use of funds from the mortgage loan on Concord Drive, and Feig's admission that her handwriting appears on some of the loan documents also supports a finding that Feig acted as Weiss's nominee with respect to the purchase of Concord Drive. However, Feig denies knowing that she signed a mortgage or that she signed checks for the proceeds, which testimony is supported by Weiss's affidavit. These disputes require credibility determinations that cannot be resolved by summary judgment.

The United States contends, alternatively, that if Feig's testimony is believed, she does not have standing to contest the forfeiture of Concord Drive because she was merely the nominal title holder of the property on behalf of her father. Feig presented evidence that her father died about two years after Concord Drive was purchased. Thereafter, Feig continued to be the owner of record of Concord Drive, and she paid bills for Concord Drive. She also presented testimony that she made the independent decision in 2003 to refinance the mortgage on the property. This testimony is sufficient, for purposes of summary judgment, to establish that Feig exercised dominion and control over Concord Drive after her father's death. Therefore, Feig has presented sufficient evidence of standing to contest the forfeiture of Concord Drive for purposes of summary judgment.

Accordingly, the motion for summary judgment based on Feig's lack of standing to contest the forfeiture of Concord Drive should be **DENIED.**

B. *Feig's Motion for Summary Judgment.*

Feig filed a motion for summary judgment based on her assertion that the lapse of time between the forfeiture judgment entered after Weiss's criminal trial and entry of the Preliminary Order of Forfeiture of Substitute Assets violated her due process rights and constitutes laches. Doc. No. 2329.

1. *Due Process.*

The United States filed its petition of forfeiture for Viola Road and Concord Drive more than nine years after the entry of the Special Verdict of Forfeiture in the criminal case. Feig asserts that the nine-year delay has deprived her of a meaningful opportunity to be heard in violation of her due process rights under the Fifth Amendment to the Constitution.

Feig admits that the United States met the statute of limitations under 18 U.S.C. § 1963 by filing an indictment, including a forfeiture count, within the five-year period applicable to the underlying offenses. Feig also concedes that Federal Rule of Criminal Procedure 32.2(e)(1)(B) specifies that the court may "at any time" amend an existing order of forfeiture to include substitute property that qualifies for forfeiture. However, she argues that the criminal forfeiture provisions of § 1963 and Rule 32.2 are unconstitutional as applied in this case, because the nine-year delay has effectively denied her a meaningful opportunity to be heard. Doc. No. 2329 at 2–3.

Feig is correct that the due process clause at a minimum requires a meaningful opportunity to be heard. *Ricci v. Chicago Mercantile Exchange,* 409 U.S. 289, 320, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973). A meaningful opportunity to be heard "comprehends within it a right to be heard without unreasonable delay." *Id.* Feig contends that property rights are protected in forfeiture proceedings by the due process clause and that where an inordinate delay occurs, the owner may file a motion seeking dismissal of the case on due process grounds. *Id.* at 3. However, all of the cases Feig cites for these propositions are distinguishable because the

property at issue had been seized by the United States.

In *Acadia Technology, Inc. v. United States,* 458 F.3d 1327, 1333–34 (Fed.Cir. 2006), that court stated: "Following seizure of property, the owner of the property has a due process right to either have the government return the property or initiate forfeiture proceedings without unreasonable delay." Feig's property has not been seized, and thus, *Acadia* does not support the existence of a due process claim regarding the timeliness of a forfeiture claim without seizure of the property.

Similarly, Feig cites *United States v. $7,990 in U.S. Currency,* 170 F.3d 843, 846 (8th Cir.1999), *United States v. Lazarenko,* 476 F.3d 642, 651 (9th Cir.2007), and *United States v. One 1973 Buick Riviera Automobile,* 560 F.2d 897, 901 (8th Cir.1977), which address the due process rights of property owners where the property has been taken by the government and then there was an asserted delay in a forfeiture proceeding. Feig's property has not been taken.

Nonetheless, Feig asserts that her due process claim should be analyzed using the four factors outlined in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). These factors are the length of the delay, reason for the delay, the defendant's assertion of right, and prejudice to the defendant. *Id.* at 530, 92 S.Ct. 2182. The United States Supreme Court applied the *Barker* factors to a post-seizure forfeiture in *United States v. Eight Thousand Eight Hundred and Fifty Dollars in U.S. Currency,* 461 U.S. 555, 564–65, 103 S.Ct. 2005, 76 L.Ed.2d 143 (1983). Feig has not cited any case supporting the application of these factors to a forfeiture proceeding such as this, where the property at issue was not seized. However, the Court will analyze Feig's claim utilizing these factors in an abundance of caution.

### a. Length of the delay.

Feig asserts that the length of the delay in filing the motion for forfeiture was nine years, two months, and two weeks. Doc. No. 2329 at 4. Feig asserts that even though she was not deprived of the use of these properties for nine years, the effect of forfeiting the properties now is the same as if they had been seized nine years ago. She contends that she would have been better off with an earlier forfeiture proceeding.

Federal Rule of Criminal Procedure 32.2 provides that a forfeiture proceeding may be brought "at any time," which tracks the purpose of the forfeiture statutes and case law. *See, e.g., United States v. Casey,* 444 F.3d 1071, 1074 (9th Cir. 2006) (if the defendant is insolvent at the time of sentencing, the court must impose a money judgment that remains in effect until it is satisfied); *United States v. Hall,* 434 F.3d 42, 59 (1st Cir.2006) (even if a defendant does not have sufficient funds to cover the forfeiture at the time of conviction, the Government may seize future assets to satisfy the order to ensure he does not profit from his criminal activity); *United States v. Baker,* 227 F.3d 955, 970 (7th Cir.2000) (the money judgment places a lien against the defendant personally for the duration of his prison term and beyond); *United States v. Delco Wire and Cable Co., Inc.,* 772 F.Supp. 1511, 1517 (E.D.Pa.1991) (criminal forfeiture is "like a money judgment that runs against the defendant until satisfied in full"); *see also United States v. Vampire Nation,* 451 F.3d 189, 202–03 (3d Cir.2006) (following *Casey, Hall,* and *Baker* ).

As the United States points out, in analogous situations much longer periods are allowed for collection of judgments. *See, e.g.,* 18 U.S.C. § 3613(b) & (f) (liability to pay a fine or restitution shall terminate the later of 20 years from the entry of

judgment or twenty years after release from imprisonment); 28 U.S.C. § 3201 (pursuant to Federal Debt Collection Procedures Act, a civil judgment creates a lien on all real property of the judgment debtor which is enforceable for twenty years and may be renewed for an additional twenty years). In addition, the United States Supreme Court has also stated that Congress intended for RICO statutes to be "liberally construed to effectuate [their] remedial purpose," *Russello v. United States,* 464 U.S. 16, 27, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983).

Accordingly, I find that the period of the delay does not weigh in favor of finding a due process violation, in light of language of Federal Rule of Criminal Procedure 32.2, the purpose of the forfeiture provisions, and the longer periods allowed for similar situations.

### b. Reason for the Delay.

Feig argues that the second factor, the reason for the delay, also weighs in favor of a due process violation. Feig states that the United States has been aware of Viola Road and Concord Drive since the beginning of the criminal case against Weiss and has alleged that Weiss used nominees to hold property since that time.

Section 1963(m) provides the circumstances under which the United States may seek forfeiture of substitute assets, as follows:

> If any of the [forfeited property], as a result of any act or omission of the defendant—(1) cannot be located upon the exercise of due diligence; (2) has been transferred to sold to, or deposited with, a third party; (3) has been placed beyond the jurisdiction of the court; (4) has been substantially diminished in value; or (5) has been commingled with other property which cannot be divided without difficulty; the court shall order the forfeiture of any other property of the defendant. . . .

18 U.S.C. § 1963(m). In a declaration in support of a motion for a preliminary order of forfeiture of substitute assets, IRS Special Agent Harry J. Brister detailed the efforts of the United States and the Receiver of NHL to track and recover Weiss's assets. Doc. No. 2132–1 ¶¶ 9–19. The United States cooperated with private parties, and was later able to obtain testimony from Weiss's co-conspirators which led them to seek the forfeiture of the Viola Road and Concord Drive. Notably, during this process Feig was given an opportunity, through depositions, to explain the transfer to her of Viola Road and the Separation Agreement, but she declined to do so, at one time asserting her Fifth Amendment privilege against self-incrimination. *Id.* ¶ 16.

Feig has not presented any evidence or argument that the steps taken by the United States and NHL to identify assets held by Weiss could have been completed sooner. Further, the evidence shows that Feig could have advanced the issue of her ownership of Viola Road much sooner, but she chose not to do so. Under these circumstances, the reason for the delay does not weigh in favor of Feig's argument that her due process rights were violated.

### c. Assertion of Feig's Right.

The third *Barker* factor is whether Feig has timely asserted her rights. Feig argues that because the United States delayed bringing the forfeiture action, she had no opportunity to timely assert her rights.

Feig's position fails in two respects. First, as noted above, Feig had the opportunity to explain the circumstances under which she acquired Viola Road as early as 1993, but she declined to do so. Second, Feig has repeatedly delayed the progress of the litigation of her ancillary forfeiture claim. She did not timely file her claim, Doc. Nos. 2216, 2217 (Feig filed her peti-

tion for innocent ownership and motion to file her claim late on June 19, 2009, five months after the preliminary order of forfeiture was entered), and she repeatedly sought extensions of time, Doc. No. 2300 (Feig requested an extension of time to complete discovery and file dispositive motions); Doc. No. 2315 (Feig sought additional discovery following the expiration of the discovery deadline); Doc. No. 2322 (the Court notes Feig's pattern and practice of "deliberate delay and failure to comply with Court orders.").

Accordingly, I find that this factor weighs against any due process violation.

### d. Prejudice to Feig.

The fourth *Barker* factor is whether there has been any prejudice to Feig due to the delay. Feig asserts that memories have faded and evidence has disappeared due to the nine-year delay. In considering this factor, the United States Supreme Court has stated that the "consideration of prejudice is not limited to the specifically demonstrable." *Doggett v. United States*, 505 U.S. 647, 655, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). The Court cautioned that the importance of this factor increases with the length of the delay.

In *Doggett*, however, the Court cited an "egregious persistence in failing to prosecute" the defendant. As discussed above, the United States has acted diligently in its attempt to locate and collect Weiss's assets. The evidence shows that Feig obstructed and delayed this process.

Furthermore, the Court notes Feig served as a surety on a $500,000 appearance bond securing Weiss's pretrial release, and posted a mortgage in the amount of $100,000 on Viola Road as security for his release. Doc. No. 173. After Weiss failed to appear during trial, the United States filed a motion to forfeit the bond, a copy of which was served on Feig. Doc. No. 1256. Feig took no action to challenge the forfeiture. As a result, a Judgment of Default was entered in 1999 against Weiss and Feig in the amount of $500,000. Doc. No. 1285. Since that time, the United States could have sought to foreclose on the mortgage on Viola Road and levied on the Concord Drive property to satisfy Feig's judgment debt. Under these circumstances, Feig and her family have been rewarded with many years of use and enjoyment of Viola Road and Concord Drive to which they would not have been entitled if the United States has initiated collection efforts against these properties to satisfy Feig's debt to the United States. Therefore, the final factor in the *Barker v. Wingo* analysis also does not support Feig's due process argument.

Accordingly, Feig has failed to present evidence sufficient to support her claim that any delay in bringing this forfeiture action deprived her of due process.

### 2. *Laches.*

In the alternative, Feig asserts that the forfeiture is barred by the equitable doctrine of laches. To establish laches, Feig must show a delay in the proceedings, that the delay was unexcusable, and that the delay caused undue prejudice to Feig. *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1545 (11th Cir.1986) (citations omitted). Feig asserts that where the delay is outrageous, inexcusable and unreasonable, then laches may be established without a showing of prejudice, citing *United States v. Barfield*, 396 F.3d 1144, 1151 n. 10 (11th Cir.2005).

In *United States v. Summerlin*, 310 U.S. 414, 416, 60 S.Ct. 1019, 84 L.Ed. 1283 (1940), the United States Supreme Court wrote that "[i]t is well settled that the United States is not … subject to the defense of laches in enforcing its rights." The Eleventh Circuit continues to follow *Summerlin*. *See United States v. Moore*, 968 F.2d 1099, 1100 (11th Cir.1992) (quoting *United States v. Summerlin*, 310 U.S.

414, 416, 60 S.Ct. 1019, 84 L.Ed. 1283 (1940)).

Even if the defense of laches were available against the United States, the evidence does not establish that there was any undue delay for the reasons discussed above. Finally, a claimant seeking to rely on an equitable defense, such as laches, must come before the Court with "clean hands." Because Feig has contributed substantially to the delay in seeking forfeiture of Viola Road and has continued to impede the resolution of her claim to Viola Road and Concord Drive, she has not established that she comes before the Court with clean hands.

Thus, Feig has failed to show that laches applies here.

### 3. *Insufficient Basis for Forfeiture Order.*

Feig alleges that the United States presented insufficient evidence to support the Court's Preliminary Order of Forfeiture of Substitute Assets. Doc. No. 2137. Specifically, Feig alleges that the only allegations in support of forfeiting the Concord Drive property were the following: (1) that Weiss used nominees to hold property; and (2) that Feig asserted her Fifth Amendment rights and did not testify regarding the property. Feig asserts that this evidence is insufficient to support the Preliminary Order of Forfeiture of Substitute Assets.

The Preliminary Order of Forfeiture of Substitute Assets is an adjudication that Defendant Weiss's interest in the identified substitute assets should be forfeited. The purpose of the ancillary proceedings is to resolve the extent to which Weiss has an interest in the substitute assets. Accordingly, Rule 32.2(b) provides that a preliminary order of forfeiture is entered "without regard to any third party's interest in the property." Therefore, Feig does not have standing to challenge the preliminary order of forfeiture finding that De-fendant Weiss's interest in Viola Road and Concord Drive is subject to forfeiture under the substitute asset provision. Rather, the ancillary proceeding is the vehicle through which Feig may present evidence that Defendant Weiss has no interest in the substitute properties. *See United States v. Cone,* 627 F.3d 1356, 1358 (11th Cir.2010) (non-party claimants do not have standing to challenge Court's decision regarding preliminary order of forfeiture entered in the criminal case); *see also United States v. Muckle,* 709 F.Supp.2d 1371, 1374 (M.D.Ga.2010) (third-party claimant has no right to challenge the preliminary order's finding of forfeitability); *United States v. Rothstein,* No. 09–60331–CR–COHN, 2010 WL 2351466, at *2 (S.D.Fla. June 11, 2010) (same).

Accordingly, Feig's motion for summary judgment should be **DENIED.**

## V. RECOMMENDATION.

Based on the foregoing, I respectfully recommend that the United States' motion for summary judgment, Doc. No. 2327, be **DENIED,** and Feig's motion for summary judgment, Doc. No. 2329, be **DENIED.**

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.